**The TOLEDO HOSPITAL,**
**Plaintiff–Appellant,**

v.

**Donna E. SHALALA, Secretary, Department of Health and Human Services, Defendant–Appellee.**

No. 95–3858.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 9, 1996.

Decided Jan. 13, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied March 27, 1997.

---

Ronald N. Sutter (argued and briefed), Powers, Pyles, Sutter & Verville, Washington, DC, for Plaintiff–Appellant.

Neil H. Koslowe (argued and briefed), Office of the Attorney General, Civil Division, Washington, DC, for Defendant–Appellee.

Before: BOGGS and NORRIS, Circuit Judges; HOOD, District Judge.*

ALAN E. NORRIS, Circuit Judge.

At issue in this case is the validity of the Medicare reaudit regulation, 42 C.F.R. §§ 413.86(e)(1)(ii)-(iii). For the following reasons, we conclude that the reaudit regulation is invalid under the guidelines set out by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

## I. Regulatory Framework

From 1965 to 1986, the Medicare program reimbursed participating hospitals, known as providers, for the reasonable costs incurred in furnishing graduate medical education ("GME"). The Secretary of Health and Human Services (the "Secretary") delegated the task of administratively determining these costs to fiscal intermediaries. The procedure for determining a provider's reasonable costs

for GME involved several steps. First, providers would submit a cost report to a fiscal intermediary shortly after the end of the reporting year. *See* 42 C.F.R. § 413.24(f)(2)(i) (1995). The fiscal intermediary would then issue a notice of program reimbursement (an "NPR"). *See* 42 C.F.R. § 405.1803(a) (1995). A provider dissatisfied with the allowed costs could appeal the intermediary's determination to the Provider Reimbursement Review Board (the "Board"). *See* 42 U.S.C. § 1395*oo* (a)(1); 42 C.F.R. § 405.1835(a) (1995). Judicial review of final decisions of the Board was authorized by 42 U.S.C. § 1395*oo* (f)(1).

To aid in the audit and review of providers' claims, the Secretary required each provider to retain records pertaining to its physicians' compensation, as well as the amount of time each physician devoted to Medicare versus non-Medicare duties. 42 C.F.R. § 405.481(g)(3) (1995), *removed,* 60 Fed.Reg. 63,124, 63,175 (1995). The Secretary required that such records be retained for at least four years after the end of each cost reporting period to which the allocation applies. *Id.* To further ensure the accuracy of the audit process, the Secretary allowed for the reopening of a cost determination within three years of the last administrative action taken with respect to the year in question. *See* 42 C.F.R. § 405.1885(a) (1995).

In April of 1986, Congress enacted the Comprehensive Omnibus Budget Reconciliation Act of 1986 (the "Act"), Pub.L. No. 99–272, 1986 U.S.C.C.A.N. (100 Stat.) 82. Among the changes adopted, the Act converted GME reimbursements from a pass-through basis to a per-resident reimbursement indexed to a base year. Section 9202(a) of that act amended § 1886 of the Social Security Act, 42 U.S.C. § 1395ww, by, among other things, enacting 42 U.S.C. § 1395ww(h)(2)(A), the current version of which reads as follows: "The Secretary shall determine, for the hospital's cost reporting period that began during fiscal year 1984, the

---

* The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

average amount recognized as reasonable under this subchapter for direct graduate medical education costs of the hospital for each full-time-equivalent resident." 1986 U.S.C.C.A.N. (100 Stat.) at 171–72 (the "GME amendment"). Section 9202(a) further provides that the base year per-resident average would be adjusted for inflation and used to calculate GME reimbursements for future years. *See* 42 U.S.C. §§ 1395ww(h)(2)(C)-(D). Section 9202(b) of the Act provides that the amendments in § 9202(a) "shall apply to hospital cost reporting periods beginning on or after July 1, 1985." 1986 U.S.C.C.A.N. (100 Stat.) at 175.

While the Act was passed in April of 1986, the Secretary waited until September of 1989 to adopt implementing regulations. *See* 54 Fed.Reg. 40,286, 40,316–17 (1989) (Codified at 42 C.F.R. § 413.86(e)(1)). These regulations first instruct the fiscal intermediaries to verify that the costs allowed for each provider for the base year, fiscal year 1984, are accurate and to exclude any costs improperly allowed in the initial audit. *See* 42 C.F.R. §§ 413.86(e)(1)(i)-(ii) (1995). The regulations then address GME cost determinations that are more than three years old and, therefore, are no longer subject to reopening: "If the hospital's cost report for its GME base period is no longer subject to reopening under § 405.1885 of this chapter, the intermediary may modify the hospital's base-period costs solely for purposes of computing the per resident amount." 42 C.F.R. § 413.86(e)(1)(iii) (1995) (together with 42 C.F.R. § 413.86(e)(1)(ii), the "reaudit regulation"). Thus, finding that a provider's 1984 GME costs were too high would not require repayment from the provider for that year if the reaudit occurred after the end of the reopening period. Because many providers had disposed of their records for 1984 after having retained the documents for the requisite four-year period, the Secretary allowed providers who no longer had their 1984 records to submit information from subsequent years as evidence of the number of residents and the percentage of time dedicated to Medicare activities for the base year. *See* 55 Fed.Reg. 35,990, 36,063–64 (1990).

## II. Facts

Plaintiff, The Toledo Hospital (the "Hospital"), uses the calendar year as its fiscal year. Accordingly, its base year for purposes of the Medicare regulations ended on December 31, 1984. On February 26, 1986, a fiscal intermediary issued the NPR for 1984, recognizing that the Hospital was entitled to $5,867,705 in reasonable GME costs. The Hospital did not appeal that finding to the Board, and the three-year reopening period for the 1984 determination ended on February 26, 1989. Under the four-year record-keeping requirement, the Hospital was required to retain its physician compensation records for 1984 until December 31, 1988.

Pursuant to the reaudit regulations adopted in September of 1989, a fiscal intermediary began a reaudit of the Hospital's base year in late 1990. On January 31, 1991, the intermediary found that the initial determination of the Hospital's base-year cost was nearly forty percent too high and that the appropriate GME costs for 1984 were $4,278,371. Based upon this adjusted cost figure and the number of full-time-equivalent residents for 1984, the intermediary determined an average per-resident GME amount that results in substantially lower GME reimbursements to the Hospital for cost years beginning on January 1, 1986, than would have been the case if the original cost figure had been used.

The Hospital appealed the fiscal intermediary's reaudit calculation to the Board. On December 17, 1993, the Board ruled that it lacked authority to decide the validity of the Secretary's reaudit regulation, thereby allowing for immediate judicial review in the district court. *See* 42 U.S.C. § 1395*oo* (f)(1). Shortly thereafter, the Hospital filed this suit in the United States District Court for the Northern District of Ohio seeking both declaratory and injunctive relief. The Hospital

argued that (1) the reaudit regulation is impermissibly retroactive, (2) the regulation conflicts with the Medicare statute, and (3) the regulation is arbitrary and capricious. On March 27, 1995, the Hospital filed a motion for summary judgment, and the Secretary filed a cross-motion for summary judgment on March 30, 1995. On June 23, 1995, the district court issued an order granting summary judgment in favor of the Secretary and denying the Hospital's summary judgment motion. The Hospital filed this appeal.

### III. *Chevron* Analysis

We review the district court's grant of summary judgment de novo. *See Holiday Inns, Inc. v. 800 Reservation, Inc.*, 86 F.3d 619, 622 (6th Cir.1996). Because the denial of the Hospital's motion for summary judgment was based entirely upon a ruling of law, rather than the presence of factual issues for trial, we review that decision de novo as well. *See Greene v. Reeves*, 80 F.3d 1101, 1104 (6th Cir.1996). The familiar standard for assessing the validity of federal regulations appears in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984):

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781–82 (footnotes omitted). Moreover, "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n. 9, 104 S.Ct. at 2781 n. 9.

The Hospital argues that *Chevron* does not apply in the present case because of the retroactive nature of the reaudit regulation. Although courts generally do not defer to retroactive agency regulations when the statutes that they implement do not require retroactive application, the reaudit regulation does not amount to an impermissible retroactive regulation. In *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Supreme Court defined the test for retroactivity as "whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at 270, 114 S.Ct. at 1499. While the reaudit regulation does require a determination based upon events occurring in the base year, it does not change the standards under which the base year costs are to be determined. Thus, we believe that *Chevron* applies in this case.

### A. Step One: Plain Meaning

The first step in the *Chevron* analysis is to determine whether Congress has expressed an intent on the issue at hand. That intent can appear in the language of the statute, or it can become apparent in light of the statutory scheme taken as a whole. The GME amendment directs the Secretary "to determine, for the hospital's cost reporting period that began during fiscal year 1984, the average amount recognized as reasonable under this subchapter for direct graduate medical education costs of the hospital for each full-time-equivalent resident." 42 U.S.C. § 1395ww(h)(2)(A). The Hospital contends that the plain meaning of this language prohibits the Secretary's reaudit regulation, which directs the fiscal intermediaries to recalculate the 1984 GME costs even after the three-year reopening period has expired.

Determining whether a statute is unambiguous is not always an easy matter. The first court to address the validity of the reaudit regulation, the District Court for the District of Columbia, held that the regulation contradicts the plain language of the statute. *See*

*Methodist Hosps. v. Sullivan,* 799 F.Supp. 1210, 1216–17 (D.D.C.1992), *rev'd sub nom. Administrators of the Tulane Educ. Fund v. Shalala,* 987 F.2d 790 (D.C.Cir.1993), *cert. denied,* 510 U.S. 1064, 114 S.Ct. 740, 126 L.Ed.2d 703 (1994). In reversing the district court, however, the Court of Appeals for the District of Columbia discovered ambiguity in the words "determine," "recognized as reasonable," and "under this subchapter." *Administrators of the Tulane Educ. Fund v. Shalala,* 987 F.2d 790, 794–96 & n. 6 (D.C.Cir.1993), *cert. denied,* 510 U.S. 1064, 114 S.Ct. 740, 126 L.Ed.2d 703 (1994). The next three courts to address this issue, beginning with the district court in the case at bar, relied heavily upon the reasoning in *Tulane* and concluded that the statute is ambiguous. *See Toledo Hosp. v. Shalala,* No. 3:94CV7080, slip op. at 8–9 (N.D. Ohio June 23, 1995); *St. Paul Ramsey Medical Ctr., Inc. v. Shalala,* 1995 WL 879969, at 2 (D.Minn. Aug. 8, 1995), *aff'd,* 91 F.3d 57 (8th Cir.1996); *St. Paul–Ramsey Medical Ctr., Inc. v. Shalala,* 91 F.3d 57 (8th Cir.1996).

Before proceeding with our own examination of the GME amendment, we consider it worthwhile to review the approaches taken by the two courts of appeals that have had occasion to address the validity of the reaudit regulation. The Court of Appeals for the District of Columbia in *Tulane* began its analysis with the following summary:

[W]e do not believe that Congress spoke directly to the precise question of whether HHS should, in determining the base period GME per resident amount, automatically adopt the GME sum approved for reimbursement to hospitals for 1984 or whether it retained the residual authority to reassess at a later date the reasonableness of that calculation for prospective use only. *Given this ambiguity,* we find that HHS reasonably determined that Congress would not likely have wished misclassified and nonallowable costs inadvertently reimbursed to hospitals for fiscal year 1984 to be "cemented" into the base period amount and indefinitely carried forward in the formula for future reimbursements. *To avoid that eventuality, HHS must retain the ability to revisit its 1984 reimbursements for error,* even though those figures

had previously been found reasonable, since the sole purpose of the reauditing was to calculate the base period formula applicable under the 1986 statute for fiscal year 1985 and later years.

987 F.2d at 792 (emphasis added).

The court identified the crux of the matter as follows:

The issue thus devolves into whether, assuming its knowledge of the long-standing regulation providing for a three year period for reopening approved costs, 42 C.F.R. § 405.1885, Congress in enacting the 1986 GME Amendments left some leeway for the eventuality that HHS might not be able to promulgate and implement regulations governing the new methodology until after that three year period had lapsed, or whether, even if the new regulations should be delayed until after the three year period, Congress clearly intended to prohibit the Secretary from reauditing the 1984 costs for past errors in order to establish an accurate base period per resident amount.

*Id.* at 794. The court then identified the purpose of the 1986 statute as to establish "a new and presumably more accurate methodology for reimbursing GME costs...." *Id.* at 795. The court concluded that there is no evidence that Congress meant to preclude the Secretary from revisiting the 1984 cost determinations.

The court then went on to note that the statutory language is ambiguous:

Finally, and perhaps most importantly, the relevant phrase "amount recognized as reasonable under this subchapter" is on its face ambiguous. We know only one thing for sure, that it certainly could not have included any amounts already finally approved before the statute was enacted since, in 1986, every hospital's 1984 NPR was still subject to the three year reopening period. *See* 42 C.F.R. § 405.1885. But beyond that given, it is decidedly unclear that the statute meant to allow the Secretary to use only the GME cost figure that would emerge as reasonable through the regular NPR review and three year reopening process. It might just as well

have permitted the Secretary the option of using a figure that would be "recognized as reasonable under this title" at a later time after more careful assessment.

*Id.* at 796.

In a footnote, the court also considered the ambiguity of the word "determine":

> We also note that because the statute directs the HHS to "determine" the "average amount" of GME costs per FTE resident "recognized as reasonable," it seems unlikely that Congress intended for the HHS to simply look up a hospital's approved NPR for 1984 and plug it into the statutory formula. This activist language suggests that Congress must have intended for the agency to make some kind of substantive calculation on its own, which might involve as well a current assessment of the reasonableness of prior determinations.

*Id.* at 796 n. 6.

The Court of Appeals for the Eighth Circuit explicitly adopted the reasoning of *Tulane* in *St. Paul–Ramsey Medical Ctr., Inc. v. Shalala,* 91 F.3d 57, 58 (8th Cir.1996).

▆ With due respect to our sister courts, we believe that the approach taken by the court in *Tulane* misperceives the policy underlying *Chevron* deference. *Chevron* instructs courts to accept a reasonable administrative interpretation of a statute where Congress has delegated decisional autonomy to an agency. When Congress intentionally leaves gaps and ambiguous terms in a statute for the agency to flesh out, the principle of separation of powers counsels that this legislative delegation be respected by the judiciary. It is an entirely different matter, however, to presume a delegation of interstitial rulemaking authority when the claimed ambiguity in the statute stems not from the use of a word with several plausible interpretations, nor from the statute's lack of specificity regarding mundane procedural issues, but from nothing more than the failure of Congress to proscribe explicitly an unusual procedure which may be plainly at odds with the result Congress was trying to reach.

It seems to us that when the court in *Tulane* parsed the GME amendment, it failed to accord proper attention and importance to the word "average," a term that is critical to understanding congressional intent. The GME amendment, in establishing a reimbursement scheme keyed to a base-year figure, introduced the concept of the per-resident average cost. This concept had not been used previously in the calculation of reimbursements and became the basis for all future payouts. Upon fulfilling the obligation imposed by the GME amendment, the Secretary would arrive at this number, the per-resident average, which would then be adjusted for inflation and utilized to determine future reimbursements. Given the introduction of this entirely new cost concept, we do not believe that the *Tulane* court was warranted in seizing upon the word "determine" as "activist language" that would authorize agency action that goes far beyond a simple calculation of the per-resident average based upon 1984 figures arrived at through the normal administrative process. *See Tulane,* 987 F.2d at 796 n. 6.

We also see no ambiguity in the language "recognized as reasonable under this subchapter." While the court in *Tulane* felt that the temporal focus of this language was open-ended, thereby permitting the incorporation of substantive regulatory standards formulated at any time, including after the enactment of the GME amendment, that interpretation is strained at best. While we agree that the use of the past participle "recognized" does not restrict the Secretary to using numbers that had been finally determined prior to the passage of the GME amendment, as all of the base-year determinations were still subject to administrative reopening in 1986, there is no basis for the additional inferential leap that the Secretary was therefore free to "recognize" these costs at any time in the future and in a manner utterly detached from the established procedural framework.

When Congress passed the GME amendment in 1986, it knew that there was an administrative scheme in place that would determine the reasonable GME costs for providers for fiscal 1984. And one must assume that Congress also knew that the 1984 determinations would remain subject to reopening

for over a year under the Secretary's existing regulations. It follows that Congress must have contemplated that the Secretary would use those administratively determined reasonable costs as the basis for calculating the average GME cost per full-time-equivalent resident. Indeed, it seems unlikely that Congress, having chosen for its benchmark a cost year still subject to reopening under the existing Medicare regulations, would have been contemplating anything else when it passed the amendment.

The strongest argument for ambiguity may stem from an inference that, because Congress must have understood that regulations might not be forthcoming until after the 1984 cost determinations had ceased to be subject to reopening, it intended that the Secretary would have the authority to reaudit the base-year numbers. That argument is circular, however, as it presupposes that Congress intended the GME amendment to require a reassessment of the 1984 costs. Only if the amendment would assign to the Secretary a new and substantial administrative burden would there be a congressional expectation that implementing regulations would take any real time to formulate. The Secretary argues that a three-year delay in enacting implementing regulations is understandable and foreseeable in light of the "complex statutory scheme," a phrase that seems to be invoked any time a statute occupies more than a page of the United States Code. However, the statute and its contemplated result are not at all complex. A major overhaul of the Medicare system might entitle the Secretary to consume a considerable amount of time in preparing regulations. That surely is not the case with the GME amendment, which merely directs the Secretary to divide one number by another. Moreover, if, as it seems clear to us, Congress intended the actual 1984 costs to be plugged into the per-resident average calculation, it was not attempting to create work for the Secretary with respect to the cost determination. And it follows that, since there was no such extra work contemplated and there was no reason to suppose that promulgating regulations would consume three years, there was no reason to address in the statute the specific issue of authority to reaudit closed base years.

What the Secretary is really saying is that Congress must have contemplated that the administrative mechanism to determine reasonable GME costs, created by Congress and implemented by the Secretary's regulations, might not work as well as planned. The Secretary's argument concedes that her agents, the fiscal intermediaries, were not as diligent as they could have been when they initially audited the 1984 numbers. The rationale offered by the Secretary is that because each year's cost determination formerly had no impact beyond that year, it was not as important at that time to get the numbers exactly right. Only now, when Congress has designated a base year that will affect future reimbursements, has it become essential that the fiscal intermediaries root out errors. However, when the statutory language is read in the context of the circumstances surrounding its adoption, it is difficult to come to any conclusion other than that Congress anticipated that the administrative scheme already in place would function properly and arrive at the true reasonable GME costs for fiscal 1984 and that these numbers would then be divided by the number of residents to yield the per-resident average costs. Congress could not have foreseen the Secretary's delay in issuing the regulations and her claim that the initial 1984 cost determinations were unreliable. Otherwise, it might well have authorized the reaudit scheme, or simply have selected a different base year.

The Secretary suggests that there was no choice but to reaudit, given the delay in issuing the regulations. It would not be "reasonable" under the GME amendment, the argument runs, to use a base-year cost figure that had since been discovered to be unreliable, so the statute required a recalculation. The answer to that argument is that the Secretary was without authority to issue the reaudit regulation. The Secretary should have either used the administratively determined 1984 figure or informed Congress of the need for further legislation.

■ The intent of Congress in enacting the GME amendment should also be considered in the context of the traditional pre-

sumption of issue preclusion with respect to administrative findings, since "Congress is understood to legislate against a background of common-law adjudicatory principles." *Astoria Fed. Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104, 108, 111 S.Ct. 2166, 2169, 115 L.Ed.2d 96 (1991). It seems to us that, absent some indication from Congress that administrative findings were not to be given preclusive effect, courts should be hesitant to permit administrative agencies to require a party to reestablish or relitigate factual matters that have already been determined with finality. *See id.* at 107–08, 111 S.Ct. at 2169. We are unable to accept the Secretary's suggestion that estoppel does not apply because the incentive to determine the issue correctly did not exist during the initial audits, or was not as strong, when each year's cost determination had no effect beyond that year. *See United States v. Berman*, 884 F.2d 916, 922–23 (6th Cir.1989). After all, the Secretary was directed by statute to determine the reasonable costs for GME, a factual question identical to the determination in the reaudit regulation and one that the Secretary was required by law to resolve. The absence of statutory language negating the presumption of issue preclusion strongly suggests that Congress intended the Secretary to use the 1984 costs derived through the ordinary administrative process.

Finally, it is difficult to imagine that, had Congress intended the result urged by the Secretary, it would have used the language that ultimately found its way into the statute. Instead, a statute focusing on reaudits possibly leading to new, reasonable cost figures, could be expected to include directions to the Secretary to "determine, for the hospital's cost reporting period that began during fiscal year 1984, the amount recognized as reasonable under this subchapter for graduate medical education and the average cost of graduate medical education for each full-time-equivalent resident," or something similar. Surely, such a statute would not, as did the actual GME amendment, direct the Secretary to "determine" solely "the average amount." It seems apparent that the only substantive calculation contemplated by the statute is this per-resident average, and there is no basis for asserting that the 1984

figures should be reassessed outside the existing administrative scheme.

■ Under *Chevron* analysis, a regulation does not survive the first step merely because there is a metaphysical possibility that the statute could be read in the manner advocated by the agency. The GME amendment does not, by its terms, explicitly proscribe the reaudit that occurred in this case. Nevertheless, the statutory framework, as well as the regulations in place at the time that the GME amendment was enacted, provide clear illumination of the will of Congress. When this court can readily discern that an agency has strayed from the path intended by Congress, the inference of legislatively delegated authority vanishes. In the absence of delegated authority, *Chevron* deference is not warranted. Accordingly, we believe that the reaudit regulation is inconsistent with the legislative intent behind the GME amendment, and thus that it fails under the first prong of *Chevron*.

### B. Step Two: Reasonableness

■ When a regulation satisfies step one of *Chevron*, the analysis shifts to a determination of whether the agency's construction of its statute is reasonable. The review for reasonableness examines whether the agency properly exercised its discretion within the sphere of its delegated authority. Review of this question centers on whether the agency action either "fills a gap" or otherwise fits within "the legislature's revealed design." *NationsBank of North Carolina v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, —— – ——, 115 S.Ct. 810, 813–14, 130 L.Ed.2d 740 (1995). Although we have concluded that the reaudit regulation fails at the first step of *Chevron*, we hold in the alternative that the reaudit regulation is an unreasonable interpretation of the GME amendment.

The two key considerations that led the court in *Tulane* to conclude that the reaudit regulation satisfies the second prong of *Chevron* were (1) the interest in preventing erroneous cost determinations from being perpetuated in the form of excessive future reimbursements and (2) the time needed by the Secretary to regulate within a "complex

statutory scheme." *Tulane*, 987 F.2d at 797. The Secretary argues that a failure to reaudit would have been unreasonable, given the presumed intent of Congress to eliminate mistakes in the base-year calculations. The Secretary notes that the reaudits have resulted in many instances in findings of much lower base-year costs than were originally determined through the normal administrative mechanism. The Secretary also argues that it could have amended the reopening regulation to allow for a longer reassessment window. The district court in this case also stressed that the hospitals had at least some notice of the possibility of reauditing, *see* 53 Fed.Reg. 36,589, 36,591–92 (1988), and thus should have retained their physician compensation allocation records beyond the four-year period.

The Hospital responds that, because (1) the records have been disposed of, (2) many of the relevant hospital personnel have moved to other jobs, and (3) memories of what specific duties residents performed in 1984 have faded, there is no way that a reaudit would produce a more accurate assessment of 1984 costs than did the initial audits. As for the lower costs determined by the reaudits, the Hospital argues that the result necessarily follows from the absence of supporting documentation. Only those costs that could be proved were allowed in the reaudit, and without any records the Hospital could no longer prove as much of its GME costs as it was able to do in the original audit.

The Secretary is obviously correct that Congress did not want faulty base-year calculations to be perpetuated. What the Secretary fails to recognize is that Congress expected the Secretary to get the calculations right the first time. There is no claim that the Hospital tried to deceive the fiscal intermediary by submitting a fraudulent cost report for 1984, and the regulations expressly allow for reopening at any time where fraud is shown. *See* 42 C.F.R. § 405.1885(d) (1995). The Secretary simply claims that it was swamped with work, including coping with earlier amendments to the Medicare statute, that resulted in less attention being paid to the initial cost determinations for 1984. We believe that the principle of issue preclusion prevents the Secretary from requiring providers to reestablish the costs that they already proved years ago.

The other significant problem with the Secretary's argument is that the whole reaudit issue arose because the Secretary waited three years before issuing regulations. Had the Secretary acted promptly, there would have been no need to revisit any closed determinations, because all of the 1984 numbers were still subject to reopening for some time after the passage of the GME amendment. Even after the Secretary recognized that there might be problems with the 1984 numbers and that reaudits may be necessary, there was a delay of at least a year before the reaudit regulation was enacted. *See* Fed. Reg. 36, 589, 36, 591–92 (1988) (indicating that errors had been made in previous audits). During that year, many, if not most, of the 1984 determinations ceased to be subject to reopening.

The bottom line is that the Secretary's response to the GME amendments has been unreasonable on all counts. The Secretary read the amendments as requiring a substantive reevaluation of the 1984 numbers. The Secretary waited far too long to issue regulations, justified solely by the nebulous assertion of statutory and regulatory complexity. While there was a brief mention in the Federal Register of the possibility of reaudits once the Secretary came to suspect that the base-year calculations may have been flawed, those comments cannot be considered notice of the need to retain physician allocation and compensation records when all that the Secretary would have had to do to mitigate the harm here was to (1) extend the reopening period, (2) extend the record-keeping period, or (3) reopen all of the 1984 determinations. The Secretary ignored the principle of collateral estoppel and the basic fairness issues implicated. Finally, the Secretary ordered the reaudits to occur only after the providers had been permitted to dispose of the records necessary to allow for a meaningful audit.

The predicament was of the Secretary's making and it is unreasonable to expect the Hospital to answer for it. Accordingly, we

believe that the reaudit regulation fails step two of *Chevron.*

### IV. Conclusion

The judgment of the district court, granting summary judgment to the Secretary and denying summary judgment to the Hospital, is **reversed**. The cause is **remanded** with instructions to grant summary judgment to the Hospital.