REGIONS HOSPITAL *v.* SHALALA, SECRETARY OF
HEALTH AND HUMAN SERVICES

No. 96–1375.   Argued December 1, 1997—Decided February 24, 1998

450

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, KENNEDY, SOUTER, and BREYER, JJ., joined. SCALIA, J., filed a dissenting opinion, in which O'CONNOR and THOMAS, JJ., joined, *post*, p. 464.

*Ronald N. Sutter* argued the cause and filed briefs for petitioner.

*Lisa Schiavo Blatt* argued the cause for respondent. With her on the brief were *Acting Solicitor General Waxman, Assistant Attorney General Hunger, Deputy Solicitor General Kneedler, Deputy Assistant Attorney General Preston, Barbara C. Biddle, Neil H. Koslowe, Harriet S. Rabb, Henry R. Goldberg,* and *Thomas W. Coons.*

JUSTICE GINSBURG delivered the opinion of the Court.

Section 9202(a) of the Medicare and Medicaid Budget Reconciliation Amendments of 1985, Pub. L. 99–272, 100 Stat. 151, 171–175, 42 U. S. C. § 1395ww(h) (GME Amendment),

provides: "The Secretary [of Health and Human Services] shall determine, for the hospital's cost reporting period that began during fiscal year 1984, the average amount recognized as reasonable under this subchapter for direct graduate medical education costs of the hospital for each full-time-equivalent resident." § 1395ww(h)(2)(A). The Amendment directs the Secretary to use the 1984 amount, adjusted for inflation, to calculate a hospital's graduate medical education (GME) reimbursement for subsequent years. § 1395ww(h) (2). The Secretary interprets the GME Amendment to permit a second audit of the 1984 GME costs to ensure accurate future reimbursements, even though the GME costs had been audited previously. 42 CFR § 413.86(e) (1996). This case presents the question whether the Secretary's "reaudit" rule is a reasonable interpretation of the GME Amendment. We conclude that it is.

## I

### A

Under the Medicare Act and its implementing regulations, 42 U. S. C. § 1395 *et seq.*, the costs of certain educational programs for interns and residents, known as GME programs, are "allowable cost[s]" for which a hospital (a provider) may receive reimbursement. 42 CFR § 413.85(a) (1996). At the close of each fiscal year, the provider prepares a "cost repor[t]." § 405.1801(b). That report, which serves as the basis for its total allowable Medicare reimbursement, shows the provider's costs and the percentage of those costs allocated to Medicare services. §§ 413.20(b), 413.24(f). The provider files the report with a "fiscal intermediary," usually an insurance company, designated by the Secretary. 42 U. S. C. § 1395h. The intermediary examines the cost report, audits it when found necessary, and issues a written "notice of amount of program reimbursement" (NAPR). The NAPR determines the total amount payable to the provider for Medicare services during

the reporting period, 42 CFR § 405.1803 (1996), and is subject to review by the Provider Reimbursement Review Board (PRRB), the Secretary, and ultimately the courts. See 42 U. S. C. §§ 1395oo(a), (b), (f)(1); 42 CFR §§ 405.1835, 405.1837 (1996).

By regulation, the Secretary may reopen, within three years, any determination by a fiscal intermediary, the PRRB, or the Secretary herself "to revise any matter in issue at any such proceedings." § 405.1885(a). In other words, the Secretary can recoup excessive (or correct insufficient) reimbursement for a given year so long as the Secretary acts within the three-year reopening window.

In April 1986, Congress changed the method for calculating reimbursable GME costs. See 42 U. S. C. § 1395ww(h). In lieu of discrete *annual* determinations of "reasonable cost . . . actually incurred," § 1395x(v)(1)(A), Congress designated a baseline year, 1984, for cost determinations, *i. e.*, costs "recognized as reasonable" for that year would serve as the base figure used to calculate GME reimbursements for all subsequent years. The GME Amendment directed the Secretary to determine a per-resident amount by dividing each provider's 1984 GME costs "recognized as reasonable" by the number of full-time-equivalent residents working for the provider in 1984. § 1395ww(h)(2)(A). The 1984 per-resident amount, adjusted for inflation, would then be used to determine the provider's GME reimbursements for all fiscal years "beginning on or after July 1, 1985." Note following 42 U. S. C. § 1395ww, p. 1131. The provider's reimbursable costs for a particular year would be computed by multiplying the inflation-adjusted 1984 per-resident amount by the provider's weighted number of full-time-equivalent residents, as determined by § 1395ww(h)(4), and the hospital's Medicare patient load, § 1395ww(h)(3)(C).

In September 1988, the Secretary published a proposed regulation to implement the GME Amendment. At that

time, the Secretary reported reason to believe some "questionable" GME costs had been "erroneously reimbursed" to providers for their 1984 fiscal year, the period Congress designated in 1986 to serve continually as the base year. 53 Fed. Reg. 36591 (1988). To prevent perpetuation of past mistakes under the new GME cost-reimbursement methodology, the Secretary proposed to give fiscal intermediaries reauditing authority to ensure that future payments would be based on an "accurate" determination of providers' 1984 GME costs. *Id.*, at 36591–36592. The final regulation, published in September 1989, instructs intermediaries to verify each hospital's base-year GME costs and its average number of full-time-equivalent residents; exclude from those base-year GME costs "any nonallowable or misclassified costs, including those previously allowed under . . . this chapter"; and, upon the hospital's request, include GME costs misclassified as operating costs during the base period. 42 CFR §§ 413.86(e)(1)(ii)(A)–(C) (1996).

The Secretary made clear that the reaudit rule permitted no recoupment of excess reimbursement for years in which the reimbursement determination had become final. 54 Fed. Reg. 40302 (1989). Rather, the rule sought to prevent *future* overpayments and to permit recoupment of prior excess reimbursement *only* for years in which the reimbursement determination had not yet become final. *Id.*, at 40301, 40302; 42 CFR § 413.86(e)(1)(iii) (1996).

B

Regions Hospital (Hospital), the petitioner, is a teaching hospital eligible for GME cost reimbursement.[1] On February 28, 1986, the Hospital received from its intermediary an NAPR for the 1984 reporting period which reflected total 1984 GME costs of $9,892,644. A reaudit commenced in late

---

[1] When the petitioner filed its petition and briefs with the Court, it was known as "St. Paul-Ramsey Medical Center." It changed its name to "Regions Hospital" on September 15, 1997.

1990 ultimately yielded a determination that the Hospital's total allowable 1984 GME costs were $5,916,868. The recomputed average per-resident amount was $49,805, in contrast to the original $70,662. The Secretary sought to use this recomputed amount to determine reimbursements for future years and past years within the three-year reopening window of § 405.1885. The reaudit determination would not be used to recoup excessive reimbursement paid to the Hospital for its 1984 GME costs, for the three-year window had already closed on that year.

On appeal to the PRRB, the Hospital challenged the validity of the reaudit rule. The PRRB responded that it lacked authority to invalidate the Secretary's regulation, and the Hospital sought expedited judicial review under 42 U. S. C. § 1395oo(f)(1). On cross-motions for summary judgment, the District Court for the District of Minnesota ruled for the Secretary. Adopting the reasoning of the Court of Appeals for the District of Columbia Circuit in *Administrators of the Tulane Educational Fund* v. *Shalala,* 987 F. 2d 790 (1993), cert. denied, 510 U. S. 1064 (1994), the District Court concluded that the language of § 1395ww(h)(2)(A) was ambiguous, and that the Secretary's reaudit regulation reasonably interpreted Congress' prescription. The District Court also held that the reauditing did not impose an impermissible "retroactive rule." App. to Pet. for Cert. 7a–8a.

The Court of Appeals for the Eighth Circuit affirmed in a *per curiam* opinion, following *Tulane. St. Paul-Ramsey Medical Center, Inc.* v. *Shalala,* 91 F. 3d 57 (1996). In a similar case, the Sixth Circuit, rejecting *Tulane,* saw no ambiguity in the GME Amendment and alternately held that even if the provision lacked clarity, the Secretary's interpretation was unreasonable. *Toledo Hospital* v. *Shalala,* 104 F. 3d 791, 797–801 (1997), cert. pending, No. 96–2046. We granted certiorari to resolve this conflict, 520 U. S. 1250 (1997), and now affirm the Eighth Circuit's judgment.

## II

The Hospital argues that the Secretary's reaudit regulation is an impermissible retroactive rule and, on that account alone, is invalid. It is an argument we need not linger over. *Landgraf* v. *USI Film Products*, 511 U. S. 244 (1994), explained that "'the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place,'" *id.*, at 265 (quoting *Kaiser Aluminum & Chemical Corp.* v. *Bonjorno*, 494 U. S. 827, 855 (1990) (SCALIA, J., concurring)), but further clarified that a prescription "'is not made retroactive merely because it draws upon antecedent facts for its operation,'" 511 U. S., at 270, n. 24 (quoting *Cox* v. *Hart*, 260 U. S. 427, 435 (1922)). The reaudit rule accords with *Landgraf*'s instruction. The rule calls for application of the cost-reimbursement principles in effect at the time the costs were incurred. A correct application of those principles, not the application of any new reimbursement principles, is the rule's objective. Cf. *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 207 (1988) (regulation at issue impermissibly invoked a new substantive standard as a basis for recouping sums previously paid to hospitals). Furthermore, the Secretary's reaudits leave undisturbed the actual 1984 reimbursements and reimbursements for any later cost-reporting year on which the three-year reopening window had closed. The adjusted reasonable cost figures resulting from the reaudits are to be used solely to calculate reimbursements for still open and future years. See *supra*, at 454.

Understandably, there is no Circuit split on this issue. Although holding against the Secretary on other grounds, the Sixth Circuit concisely stated why the reaudit rule "does not amount to an impermissibly retroactive regulation": The rule "require[s] a determination based upon events occurring in the base year," but "it does not change the standards under which the base year costs are to be determined." *Toledo Hospital* v. *Shalala*, 104 F. 3d, at 795.

## III

We turn, next, to the question that has divided the Circuits: Is the Secretary's interpretation of § 1395ww(h)(2)(A), embodied in the reaudit rule, entitled to deference? Under the formulation now familiar, when we examine the Secretary's rule interpreting a statute, we ask first whether "the intent of Congress is clear" as to "the precise question at issue." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837, 842 (1984). If, by "employing traditional tools of statutory construction," *id.,* at 843, n. 9, we determine that Congress' intent is clear, "that is the end of the matter," *id.,* at 842. But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.,* at 843. If the agency's reading fills a gap or defines a term in a reasonable way in light of the Legislature's design, we give that reading controlling weight, even if it is not the answer "the court would have reached if the question initially had arisen in a judicial proceeding." *Id.,* at 843, n. 11.

## A

We must decide whether Congress, under § 1395ww(h)(2)(A), intended to prohibit the Secretary from ensuring an accurate GME base-year amount by reauditing a provider's statement of 1984 GME costs for past errors, outside the Secretary's three-year reopening window. Put another way, does "shall determine" for the baseline year 1984 the "amount recognized as reasonable" inevitably refer to the amount *originally,* or on reopening within three years, recognized as reasonable; or could the statute plausibly be read to mean, in light of the new methodology making 1984 critical for all subsequent years, an "amount recognized as reasonable" through a reauditing process designed to catch

errors that, if perpetuated, could grossly distort future reimbursements?

Separate provisions of the Medicare Act speak clearly to the timing of other "recognized as reasonable" determinations. For example, 42 U. S. C. § 1395x(v)(1)(A) permits the Secretary to "provide for the establishment of limits [on certain costs] *to be* recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services." (Emphasis added.) Section 1395uu(c)(1)(B), which concerns payments to promote the closing or converting of underutilized hospital facilities, directs the Secretary, in determining the hospital's proper "transitional allowance," to acknowledge the "outstanding portion of actual debt obligations *previously* recognized as reasonable for purposes of reimbursement." (Emphasis added.)

Section 1395ww(h)(2)(A), in contrast, is silent on the matter of time, and therefore, we think, ambiguous. We agree with the Court of Appeals for the District of Columbia Circuit that "the phrase 'recognized as reasonable,' by itself, does not tell us whether Congress means to refer the Secretary to action already taken or to give directions on actions about to be taken." *Tulane*, 987 F. 2d, at 796. In other words, the phrase "recognized as reasonable" might mean costs the Secretary (1) *has* recognized as reasonable for 1984 GME cost-reimbursement purposes, or (2) *will* recognize as reasonable as a base for future GME calculations.

The Hospital urges that Congress could not have intended "recognized as reasonable" to mean two separate amounts: one for 1984 itself; and a lower, recalculated amount once the Secretary, cognizant that 1984 had become the base year for subsequent determinations, checked and discovered miscalculations. Why this must be so is not apparent. As the Secretary said, it is "hard to believe that Congress intended that misclassified and nonallowable costs [would] continue to

be recognized through the GME payment indefinitely." 54 Fed. Reg. 40301 (1989).[2]

We face these choices. Congress meant either for the Secretary to calculate future reimbursements using the figure emerging through regular NAPR review and the three-year reopening window, or for the Secretary to use the figure recognized as reasonable at a later time, informed by a more careful assessment. The Secretary realized, tardily, that the Hospital's reimbursement for 1984 (like that granted many other providers) was inconsistent with the reasonableness standards under the Medicare Act and its implementing regulations. Congress likely assumed that the Secretary would act in time to adjust the 1984 costs to achieve accuracy both in 1984 reimbursements and in future calculations.[3] Had Congress contemplated that the Secretary would not have responded to the 1986 GME Amendment swiftly enough to catch 1984 NAPR errors within the Secretary's

[2] The Hospital also raises the specter of the Secretary perpetually reauditing the base-year costs. Here, the Secretary had a compelling reason to reaudit the base-year costs, for those costs, under the new GME scheme, would be projected far into the future. The Administrative Procedure Act, 80 Stat. 392, as amended, 5 U. S. C. § 701 *et seq.*, which requires a court to "hold unlawful and set aside agency action" that is "arbitrary" or "capricious," see § 706(2)(A), should protect the Hospital from any future reaudits performed without legitimate reason.

[3] Congress more firmly instructed that the Secretary, no later than December 31, 1987, "shall report" to specific Committees of the Senate and House of Representatives on the need for revisions to provide greater uniformity in approved full-time-equivalent resident amounts. The date set for the report was inside the three-year reopening window. Note following 42 U. S. C. § 1395ww; see *post,* at 468. Missing the deadline by some years, the Secretary did not file the required report until March 24, 1992. The Secretary's failure to meet the deadline, a not uncommon occurrence when heavy loads are thrust on administrators, does not mean that official lacked power to act beyond it. See, *e. g., Brock* v. *Pierce County,* 476 U. S. 253, 260 (1986) (even though the Secretary of Labor did not meet a "shall" statutory deadline, the Court "would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action").

three-year reopening period, what would the Legislature have anticipated as the proper administrative course? Error perpetuation until Congress plugged the hole? Or the Secretary's exercise of authority to effectuate the Legislature's overriding purpose in the Medicare scheme: reasonable (not excessive or unwarranted) cost reimbursement?

While the Hospital's reading of the GME Amendment is plausible, it is not the "only possible interpretation." See *Sullivan* v. *Everhart*, 494 U. S. 83, 89 (1990). As Judge Wald wrote in her opinion for the D. C. Circuit: "Context is all, and . . . we believe the use of the 1984 figures for the indefinite future cautions . . . against a reading of ['recognized as reasonable'] that allows no elbow room for adjustments [to correct] prior miscalculations or errors." *Tulane*, 987 F. 2d, at 796.[4] Because the Hospital's construction is not an inevitable one,[5] we turn to the Secretary's position, examining its reasonableness as an interpretation of the governing legislation.

## B

The purpose of the GME Amendment was to *"limit payments* to hospitals" for GME costs. See H. R. Conf. Rep.

---

[4] The Hospital contends Congress did not delegate authority to the Secretary specifically to reaudit the 1984 base-year amount, in contrast to its express delegation to "establish rules" for computing the number of full-time-equivalent residents under § 1395ww(h)(4). But "the concept of reasonable costs already was a mainstay of Medicare statutes and regulations, [so] there was no need to establish any new rulemaking authority for its determination." *Tulane*, 987 F. 2d, at 795, n. 5 (citations omitted). See 42 U. S. C. §§ 1395x(v)(1)(A), 1395hh(a)(1).

[5] The dissent acknowledges that, "in isolation the phrase 'recognized as reasonable' is ambiguous," *post*, at 466, but finds clarity when those words are read "in their entire context," *ibid.* We agree that context counts and stress in this regard what the Court has said "[o]ver and over": " 'In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.' " *United States Nat. Bank of Ore.* v. *Independent Ins. Agents of America, Inc.*, 508 U. S. 439, 455 (1993) (quoting *United States* v. *Heirs of Boisdoré*, 8 How. 113, 122 (1849)).

No. 99–453, p. 482 (1985) (emphasis added). The Secretary's reaudit rule brings the base-year calculation in line with Congress' pervasive instruction for *reasonable* cost reimbursement. The rule does not permit recoupment of any time-barred 1984 overpayment, but it enables the Secretary, for open and future years, to carry out that official's responsibility to reimburse only reasonable costs, and to prevent payment of uncovered, improperly classified, or excessive costs. See *supra*, at 454.

Until the GME Amendment in 1986, GME costs were determined annually; one year's determination did not control a later year's reimbursement. The GME Amendment, which called for a base-year GME cost determination that would control payments in later years, became law at a time when other Medicare changes were underway, including installation of a new prospective payment system (PPS).[6] See 54 Fed. Reg. 40301 (1989) (acknowledging that GME costs were not given prompt scrutiny "because of the many changes that were taking place in Medicare generally"). The GME Amendment introduced the new statutory concept of per-resident GME costs; it was this innovation that caused the Secretary "to examine GME costs that ha[d] been reimbursed in the past and to question the significant variation in costs that ha[d] been allowed." 53 Fed. Reg. 36593 (1988).

Concerned that providers may have been reimbursed erroneously, the Secretary attempted to assure reimbursement in future and still open years of reasonable costs, but no more. To accomplish this, the Secretary endeavored to strip from the base-period amount improper costs, *e. g.*, physician costs for activities unrelated to the GME program, malprac-

---

[6] The PPS scheme established fixed payment rates, based on patient diagnosis, for a provider's operating costs of furnishing in-patient care to program beneficiaries. See 42 U. S. C. § 1395ww(d); *Good Samaritan Hospital* v. *Shalala*, 508 U. S. 402, 406, n. 3 (1993). Costs incurred in connection with GME programs were excluded from the PPS scheme. 42 U. S. C. §§ 1395ww(a)(4) and (d)(1)(A).

tice costs, and excessive administrative and general service costs. The Secretary so proceeded on the assumption that Congress, when it changed the system for GME cost reimbursement, surely did not want to cement misclassified and nonallowable costs into future reimbursements, thus perpetuating literally million-dollar mistakes.

The Hospital maintains it is "irrational" to assume Congress intended the Secretary to reaudit 1984 GME costs outside the three-year reopening window of 42 CFR § 405.1885(a) (1996). We disagree. Because the period for reassessing 1984 NAPRs had closed, the Secretary's reauditing rule, by design, could affect only the base-year per-resident calculation used to compute reimbursements from 1985 onward. In effect, the Secretary altered the reopening period prescribed in the agency's regulations by lengthening the time for *base-year* GME cost correction. The Secretary did not enlarge the time the agency had to seek repayment of excess reimbursements in years closed under the three-year prescription; rather, the Secretary extended only the time for determining the proper amount of reimbursement due in subsequent years.

The GME Amendment necessitated comprehensive regulations, and the reaudit rule was formulated and issued as part of the full set of regulations. Viewed in the context of other, contemporaneous changes in Medicare and the Secretary's decision not to pursue recoupment of 1984 GME reimbursements, the three-year gap from the 1986 enactment of the GME Amendment to release of the Secretary's final regulations in 1989 was not exorbitant. As the D. C. Circuit said, three years is "not an unreasonable period for developing, proposing, permitting comment, and finalizing a regulatory framework for a complex statutory scheme." *Tulane*, 987 F. 2d, at 797.

The Hospital also contends Congress would not have endorsed reauditing as a fair measure, because fading memories, changes in personnel, and discarded records make it

unreasonable to demand that providers "reprove" their base-year GME costs. We note these countervailing considerations. Providers can challenge the accuracy of specific auditing principles in individual cases. 42 CFR § 413.86(e)(1)(v) (1996). Providers dissatisfied with the Secretary's determination may seek judicial review under 42 U.S.C. § 1395oo(f)(1). For providers who discarded their 1984 records, the Secretary offered "an equitable solution" permitting them, during the reaudit, "to furnish documentation from cost reporting periods subsequent to the base period in support of the allocation of physician compensation costs in the GME bas[e] period." See 55 Fed. Reg. 36063 (1990).[7] Furthermore, the reaudit rule allowed providers to request upward adjustment in their reimbursable PPS hospital-specific rate if the GME reaudit revealed previously claimed GME costs that should have been classified as operating costs eligible for PPS reimbursement. 42 CFR § 413.86(j)(1)(i) (1996).

Finally, the Hospital argues that because 42 CFR §§ 405.1807 and 405.1885(a) (1996) render an intermediary's determination "final and binding" after three years, the Secretary's reaudit regulation violates principles of issue preclusion. The initial 1984 GME cost determination, however, was made under the pre-GME Amendment regime, when "final and binding" referred only to year-by-year determination. An issue determined for one year (1984 only) is not the same as a base-year determination to be carried forward into the unlimited future. Furthermore, the base-year cost calculation was derived from an intermediary's determination in an NAPR, without a hearing before the PRRB on the reasonableness of the costs. Absent actual and adversarial

---

[7] In fact, the Hospital took advantage of the Secretary's "equitable solution." Because the Hospital did not maintain base-year records reflecting physician time for teaching medical students, it used 1989 and 1990 time studies in endeavoring to establish the accuracy of its allocation of 1984 GME costs.

litigation about base-year GME costs, principles of issue preclusion do not hold fast. See *Cromwell* v. *County of Sac*, 94 U. S. 351, 353 (1877) ("[T]he judgment in the prior action operates as an estoppel only as to those matters in issue or points *controverted* . . . . [T]he inquiry must always be as to the point or question *actually litigated.*" (emphasis added)); cf. *Thomas Jefferson Univ.* v. *Shalala*, 512 U. S. 504, 517 (1994) (declining to bind Secretary to GME cost determination previously made by intermediary).

\* \* \*

In sum, we agree with the Secretary that the reaudit rule is not impermissibly retroactive, and that it "reflects a reasonable interpretation of the law." Thus, it "merits our approbation." *Holly Farms Corp.* v. *NLRB*, 517 U. S. 392, 409 (1996). The judgment of the Court of Appeals is accordingly

*Affirmed.*

JUSTICE SCALIA, with whom JUSTICE O'CONNOR and JUSTICE THOMAS join, dissenting.

The Medicare Act requires the Secretary to reimburse teaching hospitals for the Graduate Medical Education (GME) costs attributable to Medicare services. See 42 U. S. C. § 1395 *et seq.* For fiscal years 1965 through 1984, hospitals were entitled to be reimbursed for the actual "reasonable costs" incurred each year. See §§ 1395f(b)(1), x(v)(1)(A). In 1986, however, Congress directed that thereafter reimbursement rates per full-time-equivalent resident would be indexed to each hospital's 1984 GME costs "recognized as reasonable under this subchapter," divided by the number of full-time-equivalent residents that year. See § 1395ww(h)(2)(A).[1] The Court today determines that the

---

[1] Title 42 U. S. C. § 1395ww(h)(2)(A) provides that "[t]he Secretary shall determine, for the hospital's cost reporting period that began during fiscal year 1984, the average amount recognized as reasonable under this sub-

phrase "recognized as reasonable under this subchapter" can reasonably be construed as an authorization for the Secretary to redetermine a hospital's composite 1984 GME costs, rather than as a reference to a previously made determination; and thus concludes, pursuant to *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U. S. 837, 842 (1984), that the Secretary's reaudit regulation is lawful, see 42 CFR § 413.86(e)(1)(iii) (1996).[2] See *ante,* at 452. Because I believe that the 1984 GME costs "recognized as reasonable" in 42 U. S. C. § 1395ww(h)(2)(A) must be the "reasonable costs" for which the Secretary actually reimbursed the hospitals in 1984, I respectfully dissent.

On April 7, 1986, the enactment date of the provision tying future GME reimbursements to 1984 GME costs, the Secretary had in place a longstanding procedure for determining a hospital's reasonable GME costs. Under that procedure, the three-year window during which the Secretary could revise the 1984 determinations had not yet closed for any hospital entitled to reimbursement, see 42 CFR § 405.1885(a) (1985). Indeed, for many hospitals, like Regions, the 3-year period had not yet, or had barely, begun to run, since the 1984 costs had not yet, or had only recently, been determined. On February 28, 1986, Regions' fiscal intermediary, see 42 U. S. C. § 1395h, determined that Regions had incurred reasonable 1984 GME costs of $9,892,644 (Regions was later reimbursed for that amount); that decision became final under the Secretary's regulations on March 1, 1989. Nonetheless, in 1991, pursuant to the 1989 regulation now before the Court, Regions' fiscal intermediary reopened the

chapter for direct graduate medical education costs of the hospital for each full-time-equivalent resident."

[2] Title 42 CFR § 413.86(e)(1)(iii) (1996) provides that "[i]f the hospital's cost report for its GME base period is no longer subject to reopening under § 405.1885 of this chapter, the intermediary may modify the hospital's base-period costs solely for purposes of computing the per resident amount."

prior determination of reasonable 1984 GME costs (albeit for the limited purpose of calculating future reimbursement rates), reducing them to $5,916,868.

In light of the procedures already in place for determining a hospital's reasonable 1984 GME costs when § 1395ww(h) was enacted, that provision's reference to a hospital's 1984 GME costs "recognized as reasonable under this subchapter" cannot reasonably be interpreted to authorize the Secretary to determine a hospital's 1984 GME costs anew. It is true, as the Court points out, that in isolation the phrase "recognized as reasonable" is ambiguous: it "might mean costs the Secretary (1) *has* recognized as reasonable for 1984 GME cost-reimbursement purposes, or (2) *will* recognize as reasonable as a base for future GME calculations." *Ante,* at 458. But as we have insisted, the words of a statute are *not* to be read in isolation; statutory interpretation is a "holistic endeavor," *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.,* 484 U. S. 365, 371 (1988). Viewing the words "recognized as reasonable" in their entire context, they cannot reasonably be understood to authorize a new composite cost determination.

To begin with, it should be borne in mind that § 1395ww(h)(2)(A) does not provide directly for a determination of composite costs "recognized as reasonable." It provides for a determination of *the average per full-time resident* of costs recognized as reasonable. If this is to be interpreted as an authorization for a *new* "recognition of composite-cost reasonableness," so to speak, it is a most oblique and indirect authorization—so oblique and indirect as to be implausible. That new computation of composite costs, rather than the relatively mechanical averaging of those costs per full-time resident, would have been the major feature of the provision, so that one would have expected it to read something like "the Secretary shall determine each hospital's reasonable direct GME costs for the 1984 cost re-

porting period, and the average amount of those costs attributable to each full-time-equivalent resident."

It is impossible to imagine, moreover, how the words "recognized as" found their way into the provision *unless* they were meant to refer to the recognition of reasonableness already made under the pre-existing system. The interpretation that the Court accepts treats them "essentially as surplusage—as words of no consequence," *Ratzlaf* v. *United States,* 510 U. S. 135, 140–141 (1994), which, of course, we avoid when possible.

> "We are not at liberty to construe any statute so as to deny effect to any part of its language. It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word. As early as in Bacon's Abridgment, sect. 2, it was said that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' This rule has been repeated innumerable times." *Market Co.* v. *Hoffman,* 101 U. S. 112, 115–116 (1879).

See also *United States* v. *Nordic Village, Inc.,* 503 U. S. 30, 36 (1992); *Federal Election Comm'n* v. *National Conservative Political Action Comm.,* 470 U. S. 480, 486 (1985). If § 1395ww(h)(2)(A) conferred a new cost-determination authority upon the Secretary, to be exercised in the future, it would have sufficed (and would have been normal) to direct the Secretary "to determine, for the hospital's cost reporting period that began during fiscal year 1984, the average amount recognized as reasonable under this subchapter for direct [GME] costs of the hospital for each full-time-equivalent resident." The specification of an amount *"recognized as* reasonable under this subchapter" only makes sense as a reference to a determination made (or to be made) independent of § 1395ww(h)(2)(A) itself—*i. e.,* to the amount "rec-

ognized" under the procedures already in place for determining the reasonable 1984 GME costs.   Indeed, under the Secretary's interpretation the words "recognized as" become not only superfluous but positively misleading, since without them there would be no question that authority for a new determination was being conferred.   It is an unacceptable interpretation which causes the critical words of the text to be (1) meaningless and (2) confusing.

That "recognized as" refers to a determination under the pre-existing regime is strongly confirmed by another provision of the statute that enacted § 1395ww(h)(2)(A) into law: "The Secretary . . . *shall report* to [specified Committees of the Senate and House of Representatives], *not later than December 31, 1987,* on whether [§ 1395ww(h)] should be revised to provide for greater uniformity in the approved *FTE resident amounts established under [§ 1395ww(h)(2)],* and, if so, how such revisions should be implemented."   § 9202(e), 100 Stat. 176 (emphases added).   This surely envisions that the Secretary will know the amounts established under § 1395ww(h)(2)(A) by December 31, 1987—*well within the 3-year window for revisiting and revising any teaching hospital's actual 1984 reimbursement amounts.*   The Secretary's assertion that § 1395ww(h)(2)(A) confers a *new* authority to make cost determinations can technically be reconciled with this directive for a December 31, 1987, evaluation only by saying that the new authority was supposed to be exercised before that date.   But if it was supposed to be exercised before that date, it was entirely superfluous, since all prior determinations could be revised before that date under the old authority.   In short, given the evaluation deadline, the Secretary's interpretation makes no sense.

Most judicial constructions of statutes solve textual problems; today's construction creates textual problems, in order to solve a practical one.   The problem to which the Secretary's implausible reading of the statute is the solution is simply this: Though the Secretary had plenty of time, after

enactment of § 1395ww(h)(2)(A), to correct any erroneous determinations of 1984 GME costs before the 3-year revision window closed, she (or more precisely her predecessor) neglected to do so. We obligingly pull her chestnuts from the fire by accepting a reading of the statute that is implausible. The Court asks the following question:

> "Had Congress contemplated that the Secretary would not have responded to the 1986 GME Amendment swiftly enough to catch 1984 NAPR errors within the Secretary's three-year reopening period, what would the Legislature have anticipated as the proper administrative course? Error perpetuation until Congress plugged the hole? Or the Secretary's exercise of authority to effectuate the Legislature's overriding purpose in the Medicare scheme: reasonable (not excessive or unwarranted) cost reimbursement?" *Ante,* at 459–460.

The answer to that question is easy. But it is the wrong question. Of course it can *always* be assumed that Congress would prefer *whatever* would preserve, in light of unforeseen eventualities, "the Legislature's overriding purpose." We are not governed by legislators' "overriding purposes," however, but by the laws that Congress enacts. If one of them is improvident or ill conceived, it is not the province of this Court to distort its fair meaning (or to sanction the Executive's distortion) so that a *better* law will result. The immediate benefit achieved by such a practice in a particular case is far outweighed by the disruption of legal expectations in *all cases*—disruption of the *rule of law*—that government by *ex post facto* legislative psychoanalysis produces.

I would pronounce the Secretary's reaudit regulation ultra vires and reverse the Court of Appeals.