**NORWEST BANK MINNESOTA, N.A., Plaintiff,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant.**

**Civil Action No. 00–1250(ESH).**

United States District Court, District of Columbia.

July 5, 2001.

Gloria B. Solomon, Katten, Muchin & Zavis, Washington, DC, for plaintiff.

Gregory F. Taylor, Federal Deposit Insurance Corporation, Legal Division, Washington, DC, for defendant.

### *MEMORANDUM OPINION*

HUVELLE, District Judge.

Before the Court are plaintiff's motion for summary judgment, defendant's cross-motion for summary judgment, and both parties' oppositions and replies. Having considered the pleadings and the entire record herein, the Court concludes that the Federal Deposit Insurance Corporation's ("FDIC") implementation of Section 501(b) of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") violates the plain meaning of the Act and that remand to determine whether plaintiff can realize "negative growth" for assessment purposes would be an unnecessary formality. The Court, however, remands to the FDIC only for a determination of the amount of the refund owed to plaintiff.

## BACKGROUND

### I. Statutory Background

This case arises under the Federal Deposit Insurance Act, 12 U.S.C. § 1811 ("FDIA"). In 1989, Congress passed the Financial Institution Reform, Recovery, and Enforcement Act, Pub.L. 101–73 (August 9, 1989) ("FIRREA"), which made the FDIC responsible for insuring both banks and savings associations. The FDIC was directed to maintain two separate funds for those purposes: the Bank Insurance Fund ("BIF") and the Savings Association Insurance Fund ("SAIF"). Under FIRREA, banks and savings associations were assessed insurance funds which had to be paid to the FDIC and deposited into the BIF and the SAIF, respectively. 12 U.S.C. § 1817(b). The FIRREA also permitted banks to acquire savings associations without the payment of the entrance and exit fees associated with such transactions. These mergers are known as "Oakar transactions."

Under federal law at the time of the events in question, when a bank acquired a savings association, the bank was required, for FDIC assessment purposes, to treat a portion of its total deposits as insured by the SAIF. The amount required to be treated as SAIF-insured was called the "adjusted attributable deposit amount" ("AADA"). The FDIC required the Oakar institution to pay its insurance assessment on its AADA at a rate equivalent to that applicable to SAIF institutions.

The FIRREA specified that the AADA for any semiannual period be calculated by adding three components:

(i) the amount of any deposits acquired by such [Oakar institution] in connection with any [Oakar] transaction . . . ;

(ii) the total of the amounts determined under clause (iii) for semiannual periods preceding the semiannual period for which the determination is being made under this subparagraph; and

(iii) the amount by which the sum of the amounts described in clauses (i) and (ii) would have increased during the preceding semiannual period (other than any semiannual period beginning before the date of such transaction) if such increase occurred at a rate equal to the greater of—

    (I) an annual rate of 7 percent; or

    (II) the annual rate of growth of deposits of such [Oakar institution]. . . .

12 U.S.C. § 1815(d)(3)(C).

In 1991, Congress amended Subparagraph (iii) by removing the reference to a 7% growth rate. The new language provides that the growth increment is:

(iii) the amount by which the sum of the amounts described in (i) and (ii) would have increased during the preceding semiannual period . . . if such increase occurred at a rate equal to the annual rate of growth of deposits of the [Oakar institution]. . . .

12 U.S.C. § 1815(d)(3)(C). Moreover, this amendment to Subparagraph (iii) "shall apply with respect to semiannual periods beginning after the date of the enactment of this Act [Dec. 19, 1991]." 12 U.S.C. § 1815 note.

In 1992, the FDIC, expecting that the BIF and SAIF rates would be assessed at the same rates, set an identical rate schedule for each fund. However, the FDIC determined in 1995 that the BIF was fully capitalized, and therefore, it reduced the BIF assessment rate retroactive to June 1, 1995. As a result, SAIF premiums have been higher than BIF premiums since June 1995.

## II. Factual Background

Plaintiff Norwest Bank Minnesota, N.A. ("Norwest"), a BIF member, acquired First Minnesota Savings Bank, an SAIF member, on December 14, 1990.[1] This action arises from a dispute over Norwest's AADA for the semiannual period January through June 1992. Norwest calculated its AADA for those six months on worksheets provided by the FDIC. According to 12 U.S.C. § 1815(d)(3)(C)(iii), Norwest was required to include in its AADA calculations "the amount by which the sum of the amounts described in (i) and (ii) would have increased during the preceding semiannual period."

According to the FDIC's interpretation of the statute, Norwest's AADA was to be calculated using the positive 7% growth rate assumption included in the pre 1991 law. According to Norwest, it should have been permitted to apply its actual rate, which was negative 7%. Norwest also claims that, as a result of this error, its AADA was overstated by approximately $3 million for the period June 1, 1995 through December 31, 1999.

Plaintiff did not immediately seek amendment of this calculation. The overstatement alleged by Norwest did not affect Norwest's insurance assessments from 1992 through May 1995, because the rates paid by BIF members and SAIF members were the same. However, in 1995 the BIF rate was reduced but the SAIF rate was not. Because the SAIF rate was applied to Norwest's allegedly overvalued AADA, Norwest claims that it was required to pay higher regular assessments than required by law commencing in June 1, 1995.

On May 7, 1998, Norwest requested a refund of these overpayments from the FDIC pursuant to 12 U.S.C. § 1817(e)(1). The FDIC denied Norwest's request by letter dated September 17, 1998. On April 9, 1999, Norwest requested reconsidera-

---

**1.** Norwest is now known as Wells Fargo Bank Minnesota Association.

tion from the Assessment Appeals Committee, but the request was denied on June 2, 1999. The Appeals Committee rejected Norwest's request on the merits, finding that the AADA was properly computed because "Norwest's AADA for the first semiannual period of 1992 was established as of December 31, 1991—*i.e.*, before 1992—based on deposit data for the year December 1990 through December 1991." (Pl. Motion for Summary Judgment, Ex. 1, at 62).

Norwest commenced this action in June 2000 seeking review of the FDIC's action under the Administrative Procedure Act, 5 U.S.C. § 702 ("APA"), and declaratory relief under 28 U.S.C. §§ 2201–02. Norwest contends that the FDIC has misinterpreted the statute defining insurance assessments for Oakar organizations and assessed Norwest at an erroneously high rate. As a result, Norwest claims it has overpaid insurance assessments and is therefore due a refund of approximately $3 million.

On August 28, 2000, the FDIC filed a motion to dismiss the complaint for failure to state a claim upon which relief may be granted. The FDIC argued that the language of the statute unambiguously supported the agency's interpretation: because the effective date of the amendment was December 19, 1991, the amendment should not be applied retroactively and should have no effect upon the calculation of the annual growth rate used in determining Norwest's AADA for 1992. As a result, defendant contended that the plaintiff had failed to state a claim for relief.[2]

On November 7, 2000, this Court issued a Memorandum Opinion denying the motion to dismiss. In that Opinion, the Court analyzed the FDIC's construction of the

statute under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which requires a court to consider first whether Congress spoke directly to the question at issue: if so, "that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. "Under the first step of *Chevron,* the reviewing court must first exhaust the traditional tools of statutory construction to determine whether Congress has spoken to the precise question at issue." *Bell Atlantic Telephone v. FCC,* 131 F.3d 1044, 1047 (D.C.Cir.1997) (internal quotations omitted). If, however, the statute is unclear, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. In answering that question, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Id.* at 844, 104 S.Ct. 2778. The rationale for this deference is that the agency's decision as to the meaning of the statute involves "reconciling conflicting policies and a full understanding of the force of the statutory policy ... [and] depend[s] upon more than ordinary knowledge respecting the matters subjected to agency regulations." *Id.* In short, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.*

In the Memorandum Opinion, this Court held that the agency had violated the unambiguous language of the statute in calculating Norwest's AADA for the January

---

2. The FDIC also moved to dismiss on grounds that the action was barred by the statute of limitations. This argument was rejected by the Court in its Memorandum Opinion dated November 7. 2000.

to June 1992 period. "[I]n calculating Norwest's AADA for the January to June 1992 period, the FDIC was required to use Norwest's . . . annual rate of growth of deposits . . . rather than the artificial positive 7% growth rate. Because the statutory language is clear and the agency failed to give it effect, Norwest is entitled to bring an action for judicial review of the FDIC's determination." (Memorandum Opinion at 7–8.)[3]

On November 28, 2000, the FDIC moved for reconsideration of the Memorandum Opinion, and on January 12, 2001, the Court held a hearing on this motion. That same day, this Court issued a Memorandum Opinion, *nunc pro tunc* to November 7, 2000 (the "Amended Memorandum Opinion"), affirming its previous ruling that the FDIC had violated the plain language of the statute under step one of *Chevron*. (Amended Memorandum Opinion at 7).[4]

## LEGAL ANALYSIS

### I. Standard of Review

Both parties have moved for summary judgment. A party is entitled to summary judgment where "there is no genuine issue as to any material fact and the moving

---

**3.** In the Memorandum Opinion, the Court also noted that the agency's interpretation of the statute was not based on a permissible construction of the Act under step two of *Chevron*. In support, the Court noted that the FDIC's interpretation contravenes Congress' express purpose for enacting the statute. In fact, an examination of "the history, structure, and underlying policy purpose of the statute," *Bell Atlantic*, 131 F.3d at 1048, is part of *Chevron* step one, not step two (as incorrectly noted in the Memorandum Opinion), and, here, this legislative history provides even further compelling evidence that the FDIC's interpretation is inconsistent with Congress' clear intent.

party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is an appropriate mechanism for resolving cases involving administrative rulemaking on the record, particularly where, as here, the case turns chiefly on issues of statutory construction. *See Troy Corp. v. Browner*, 120 F.3d 277, 281 (D.C.Cir.1997).

### II. Section 501(b)

■ The first issue that both parties raise on summary judgment is whether the FDIC violated the plain meaning of § 501(b) of the FDICIA in calculating Norwest's assessment for the January to June 1992 period. The Court has already ruled for Norwest on this issue twice, yet defendant virtually ignores the Court's prior orders, and instead, it argues that it has complied with § 501(b). The theory on which the FDIC bases its belief that the Court should reverse its rulings is difficult to discern. It appears that defendant is now arguing that Norwest's interpretation of the statute is impermissible because it would require the FDIC to retroactively change Norwest's "average assessment base," which was fixed as of the end of 1991, prior to the effective date of the FDICIA.[5]

---

**4.** The Court did modify other portions of its November 7 Opinion that are not relevant here.

**5.** Defendant also contends that Norwest's AADA for the January to June 1992 period was calculated as of December 31, 1992, based upon Norwest's actual deposit growth in the first two semiannual periods after the enactment of the FDICIA and in accordance with § 501(b). This argument seems to disregard not only the statute, but also the decision of the Assessment Appeals Committee and the FDIC's own rules, in which the agency clearly recognizes that AADA is used prospectively and set at the start of a given period. *See, e.g.,* 61 Fed.Reg. at 64,961. The Court therefore finds no basis for the FDIC to calculate

An institution's AADA is the sum of the amount of SAIF-insured deposits assumed in the initial Oakar transaction, increases to the initial AADA, and a component reflecting the "growth" of those combined deposits over the preceding semiannual period. *See* 12 U.S.C. § 1815(d)(3)(C). The AADA is therefore based on data from a prior period, but the AADA itself is a prospective figure, as the FDIC has recognized. "An Oakar institution's AADA is used prospectively. That is to say, an Oakar institution's AADA for a current semiannual period is set at the start of that period and is used to compute the institution's assessment for that current semiannual period." 61 Fed.Reg. 64,960, 64,961 (Dec. 10, 1996) (footnote omitted). *See also infra* note 5. Section 501(b), the FDIC acknowledges, "merely specifies the semiannual period for which the AADA is to be computed: the period for which the assessment is due." *Id.* at 64,965.

In contrast, an institution's "average assessment base" is a measure of actual deposits. A bank's "assessment base" is "equal to the depository institution's liability for deposits ... as reported in its report of condition for such date...." 12 U.S.C. § 1817(b)(4)(A) (1996). The "average assessment base," in turn, is "the average of such depository institution's assessment bases for the two dates, falling within such semiannual period, for which the depository institution is required to submit reports of condition...." 12 U.S.C. § 1817(b)(3) (1996). Defendant argues that in the original version of the Oakar Amendment, an institution's AADA was part of its average assessment base. That is, the part of the average assessment base that was SAIF-assessable was the portion of deposits equal to the institution's

AADA. Therefore, a bank's insurance assessment in one period is based on its average assessment base for the prior semiannual period, and as defendant contends, Norwest's interpretation of § 501(b) requires the Court to alter the allocation of Norwest's average assessment base between the BIF and SAIF as of December 1991.

It is true, as defendant notes, that the calculation of the AADA has both a retrospective and a prospective component. As the statute and the FDIC's own rulemaking show, an AADA for a given period is calculated based on data from a prior period. However, it is equally clear that Norwest's AADA for January through June 1992 was to be determined at the beginning of those six months and used to compute its assessments for that period. Applying a new growth rate to determine Norwest's AADA for the first six months of 1992 would not have affected the bank's previous AADA—or average assessment base. A "statute is not made retroactive merely because it draws upon antecedent facts for its operation." *Cox v. Hart*, 260 U.S. 427, 435, 43 S.Ct. 154, 67 L.Ed. 332 (1922); *see Regions Hospital v. Shalala*, 522 U.S. 448, 456, 118 S.Ct. 909, 139 L.Ed.2d 895 (1998) (upholding a "rule call[ing] for application of the cost-reimbursement principles in effect at the time the costs were incurred [because a] correct application of those principles, not the application of any new reimbursement principles, [wa]s the rule's objective"). The unambiguous language of the statute required the FDIC to use Norwest's actual rate of growth in calculating its AADA for the January to June 1992 period, and this language does not implicate any retroactivity problems, since the rate, while

Norwest's AADA for January to June 1992 on December 31, 1992, instead of on December 31, 1991.

based on historical data, applies prospectively only.

## III. Negative Growth

■ Having found that the FDIC was statutorily bound to apply the 1991 Amendment to Norwest's assessment for January through June 1992, the Court now must determine whether Norwest is entitled to recognize negative growth for 1991 in recalculating the disputed assessment.[6] Norwest argues that it is entitled to recognize negative growth, resulting in a substantially smaller assessment for the disputed period. The FDIC contends that the issue of whether negative growth should be applied to the disputed assessment should be remanded back to the agency. Both parties agree that the statute is ambiguous with respect to the issue of negative growth.

It is undisputed that the FDIC determined in 1993 that it was "possible for an institution to realize negative growth for the year." ("Guidelines for Preparing the FDIC Oakar Transaction Worksheet for Computing Annual Deposit Growth Rate for Adjusted Attributable Deposit Amounts," Pl. Motion for Summary Judgment, Ex. 2, at 2.) This statement was repeated in subsequent years (*see* Pl. Motion for Summary Judgment, Ex. 3.), and codified in the FDIC's 1996 rulemaking.

> [I]f the statute were read to allow only increases in AADAs, the statute would generate a continuing shift in the relative insurance burden toward the SAIF. Most Oakar institutions—and nearly all large Oakar institutions-are BIF-member Oakar banks. If an Oakar bank's deposit base were to shrink through ordinary business operations, but its AADA could not decline in proportion to that shrinkage, the SAIF's share of the risk presented by the Oakar bank would increase. But the reverse would not be true: if an Oakar bank's deposit base increased, its AADA would rise as well, and the SAIF would continue to bear the same share of the risk. The result would be a tendency to displace the insurance burden from the BIF to the SAIF.

61 Fed Reg. 64,960, 64,977 (Dec. 10, 1996) (footnote omitted). It is therefore clear from the record that the FDIC has carefully considered this question and has repeatedly affirmed its finding that an institution is permitted to use a negative growth in calculating its AADA.[7]

Nonetheless, the FDIC contends that, because it did not determine until 1993 that negative growth should apply with respect to the 1991 Amendment, there has been no final agency action with regard to whether negative growth could apply in calculating 1992 assessments. For that reason, defendant argues that the case should be remanded to the agency.

The Court cannot agree with defendant's reasoning. As noted, the FDIC has already carefully considered how to calculate an AADA under the 1991 Amendment, and has determined that the use of negative growth rate is permissible. The fact that the FDIC did not make this determination until 1993 is irrelevant, for the

---

6. The FDIC notes that Norwest must establish an additional proposition before the negative growth issue can be reached by the Court—whether the deposit growth component used for calculating the 1992 assessment, 12 U.S.C. § 1815(d)(3)(C)(iii), is measured over a twelve month period. The FDIC, however, has acknowledged that it does not dispute this point.

7. The FDIC continued to recognize that growth rates could be negative even when it revised its assessment calculation methodology in 1996, requiring Oakar institutions to determine their AADA quarterly, rather than annually. 61 Fed.Reg. at 64,977.

agency has failed to present any principled basis for distinguishing 1992 from all subsequent years, and, therefore, no purpose would be served by remanding on the issue of negative growth. Moreover, defendant has provided no legal authority for its argument that a remand is required where an agency has consistently interpreted the governing statute in a manner that would not permit a contrary result for only one year.

■ Instead, the FDIC sets forth two other arguments for remand. First, it contends that should the Court apply the 1993 negative growth interpretation retroactively, the FDIC would also be required to apply its other interpretations of the FDICIA retroactively to the effective date of the Act. This argument is unpersuasive, for this case presents only the issue of negative growth, which arises under a particular set of circumstances. Beginning little more than one year after the effective date of the Act, the FDIC carefully considered the issue and decided that a bank could realize negative growth for purposes of its AADA. 61 Fed.Reg. at 64,977. The FDIC has repeatedly affirmed this each year since its initial determination. (Pl.Ex.3.) And the agency has not offered any reason why negative growth, which has already been applied to assessments for every year beginning in 1993, should not also apply to 1992 assessments. Whether other regulatory interpretations would apply retroactively to the effective date of the Act is a separate and distinct issue; this Court is presented only with the narrow question of applying a negative growth calculation for 1992.

■ Second, defendant argues that an adverse ruling by the Court on this issue would impose a significant administrative burden on the agency. The FDIC notes that approximately 75 other institutions face circumstances similar to those involved here, and that there are practical and policy considerations that the FDIC should be permitted to address before negative growth is applied retroactively. Defendant fails to explain these considerations beyond its conclusory statement that administering the nation's deposit insurance system can "present complex issues that call for the agency's longstanding expertise in the area." (Def. Reply at 8.) While the Court's ruling may result in a burden, the FDIC has offered no legal authority or factual support for its argument that a remand should be ordered to alleviate some unspecified administrative burden that will befall the agency if the Court enters a ruling regarding negative growth consistent with the FDIC's longstanding practice. Thus, defendant's arguments are ultimately unavailing.

■ In general, "when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *County of Los Angeles v. Shalala,* 192 F.3d 1005, 1011 (D.C.Cir.1999) (quoting *PPG Industries, Inc. v. United States,* 52 F.3d 363, 365–66 (D.C.Cir.1995)). This rule, however, is not absolute; remand is not necessary in "the exceptional situation in which crystal-clear [agency] error renders a remand an unnecessary formality." *NLRB v. Food Store Employees Union,* 417 U.S. 1, 8, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974). In this case, the FDIC has already considered the issue of negative growth and determined that it is permissible under the FDICIA. This Court, having found that the FDICIA applies to Norwest's 1992 assessment, merely needs to apply the FDIC's ruling on negative growth to that assessment. A remand on this point would therefore be an unnecessary formality, as the FDIC has already analyzed the issue and has definitively resolved it.

## IV. Refund Due

■ There is, however, a dispute between the parties about the correct amount of the refund due Norwest for its overpaid assessments. Norwest calculates its overpayment to be $2,818,126.05; the FDIC believes the correct amount is $2,771,969.89. The $46,156.16 discrepancy corresponds with the assessment due for Period DO. (Pl. Motion for Summary Judgment, Ex. 6; Supplemental Affidavit of William V. Farrell ¶ 8.) The parties disagree whether the assessment for Period DO should be included in Norwest's total overpayment for assessments from June 1, 1995 through December 31, 1999, the time period that plaintiff has specified. Because the FDIC has not made a final decision on this issue, the Court remands the matter to the agency for the purpose of determining whether Norwest is entitled to a refund for the assessment for Period DO, and the amount of the refund due Norwest pursuant to that determination.

## CONCLUSION

For the aforementioned reasons, the Court grants summary judgment for plaintiff. The Court finds that the FDICIA should be applied to the calculation of Norwest's January June 1992 assessment, and that Norwest is permitted to use a negative growth rate in calculating its AADA for that assessment. Because there is a dispute over whether Norwest is due a refund for its assessment paid for Period DO, the Court remands to the FDIC to address that issue and to calculate the refund due Norwest pursuant to that determination.

A separate order accompanies this opinion.

## ORDER

Upon consideration of the parties' cross-motions for summary judgment and respective oppositions and replies, and the entire record herein, it is hereby

**ORDERED** that plaintiff's motion for summary judgment [33 1] is **GRANTED IN PART**; and it is

**FURTHER ORDERED** that defendant's cross-motion for summary judgment [35–1] is **DENIED**; and it is

**FURTHER ORDERED** that this matter is remanded to the Federal Deposit Insurance Corporation for it to determine, within thirty (30) days of this Order, whether Norwest is entitled to a refund for the assessment for Period DO, and, second, to determine the amount of the total refund due Norwest.

**SO ORDERED.**