SLOVITER, Circuit Judge,
dissenting:
The members of this panel agree on certain basic issues: The Government of the United States (hereafter “Government”) acted unconstitutionally when it seized the ten Golden Eagle coins that had been delivered to it on behalf of the Langbords for authentication and determined to retain those coins without proceeding to a hearing after the seizure.[1] .And I agree with the District Court and the majority that the seizure took place when the Government sent its notice that it would not return the coins.
I also agree with the majority’s view-that the Government in this case rather casually treated its obligation under CAF-RA to proceed to a hearing. Although it acted for what turned out to be good reason (i.e. that because the Double Eagles were stolen from the Mint — a conclusion reached by two fact-finders after a full hearing — they were already Government property and there was. no reason to subject them to forfeiture), the proper course of action was to institute forfeiture proceedings to allow a court to determine the disputed property rights. See United States v. Barnard, 72 F.Supp. 531, 532 (W.D.Tenn.1947); App. at 59. The District Court, who throughout this case was the Honorable Legróme Davis of the Eastern District of Pennsylvania, agreed with the Langbords. The Court held that the “appropriate and authorized remedy for the Government’s denial of Plaintiffs’ due process rights is a prompt forfeiture hearing.” App. at 166. It therefore effected a remedy by ruling: “Accordingly we will direct the Government to initiate a judicial forfeiture proceeding as part of this action on or before Monday, September 28, 2009.” Id. In other words, the Langbords won that issue.
This, however, is where my agreement with the majority ends. I definitely do not agree with the majority’s holding that the Langbords are now “entitled to the return of the Double Eagles,” Maj. Op. at 448, because the Government failed to institute judicial civil forfeiture proceedings “within 90 days” of receiving the Langbords’ self-styled seized asset claim. There is no provision of CAFRA that makes ultimate entitlement to the disputed property conditional on the amount of time before the Government files a forfeiture hearing. Although there is language in CAFRA that requires the Government to return items it seized or proceed to have the issue of ownership decided by a forfeiture proceeding, this does not mean that the claimants are entitled to ownership of the property at issue, although the jury has determined that the property belongs to the Government, which is the result the majority appears to reach.
*459 The statute does not state or suggest that the return is unconditional. In fact, the provision on which the majority relies, § 983(a)(3) provides “return the property” “pending the filing of a complaint----” Neither the legislative history nor the majority explains the meaning of the “pending” condition.
The majority also asserts that CAFRA (through incorporation of another provision) requires that notice of a seizure must be given within 60 days of a seizure, which it argues at length is required in some but not all cases. I do not agree. I believe notice is required in all cases and the Constitution and the relevant statutes so require.
Finally, the majority vacates the District Court’s award of declaratory judgment on a basis no court has accepted, and with which I cannot agree.
I
The majority’s position that the Government has lost its entitlement to its own property because it failed to follow the strict requirement of CAFRA as to the time to file a forfeiture suit has been rejected in principle by numerous courts, among them the Supreme Court of the United States, other courts of appeals, and many district courts. Those courts have held that the Government’s failure to strictly adhere to a statutory timeframe does not deprive the Government of the chance to pursue the action contemplated by the statute.
In United States v. $8,850 in U.S. Currency, 461 U.S. 555, 558, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983), the Supreme Court had before it a similar statute providing for forfeiture (in that case, of currency), which required the United States Attorney “if it appears probable that a forfeiture has been incurred” to “cause the proper proceedings to be commenced and prosecuted without delay.” Id. (citing 19 U.S.C. § 1604). The Court, through Justice O’Connor writing for eight Justices, rejected the claimant’s argument that the Government’s “dilatory” commencement of civil forfeiture violated the claimant’s right to due process. Id. at 561, 103 S.Ct. 2005. Justice O’Connor noted that “The Government must be allowed some time to decide whether to institute forfeiture proceedings.” Id. at 565, 103 S.Ct. 2005. She further commented that the issue of “the length of time between the seizure [of the item at issue] and the initiation of the forfeiture trial — mirrors the concern of undue delay encompassed in the right to a speedy trial” analyzed in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), where the Court enunciated a balancing test. 461 U.S. at 564, 103 S.Ct. 2005. After considering the relevant factors, the Court stated that although the Government’s 18-month delay instituting civil forfeiture proceedings was “substantial,” it was reasonable and the claimant had not asserted or shown that the delay prejudiced her ability to defend against the forfeiture. Id. at 569-70, 103 S.Ct. 2005. The Court reversed the holding of the court of appeals dismissing the forfeiture action and remanded for forfeiture proceedings. Id. at 570, 103 S.Ct. 2005.
That case was decided before the enactment of CAFRA, but similar reasoning has been applied by other courts dealing with forfeiture under CAFRA or statutes with similar provisions. One such example can be found in United States v. Vazquez-Alvarez, 760 F.3d 193 (2d Cir.2014). Claimant Vazquez interposed two grounds to defeat the Government’s forfeiture of currency he had carried into the- country: one, irrelevant here, was that the Government did not execute its warrant against the cash. Id. at 195. The second, most relevant here, was that the Government *460 failed to bring its forfeiture action within the time set by the statute. Id. Both, he argued, stripped the district court of its jurisdiction over the res. Id. The Second Circuit, in a per curiam opinion, stated, “We disagree. The statutory time limits for commencing a forfeiture action are claims-proeessing rules, not jurisdictional rules.” Id. Ultimately dismissing Vazquez for lack of standing, the court rejected the claimant’s allegation that he should prevail because the Government filed its civil forfeiture'action “well after the 60-day time period allotted by 18 U.S.C. § 983(a)(1)(A)(ii).” Id. at 198. It stated, “assuming without deciding that the [G]overnment filed late, a late-filed forfeiture action would not deprive the district court of subject matter jurisdiction.” Id.
The Vazquez-Alvarez court relied in part on a Fourth Circuit decision, United States v. Wilson, 699 F.3d 789 (4th Cir.2012). In Wilson, the claimant sought to set aside a forfeiture judgment as void because the Government had filed its forfeiture complaint later than § 983(a)(3)’s 90-day time limit: 699 F.3d at 791. The claimant had not raised the timing objection during the forfeiture proceeding, but argued that “the time limit was jurisdictional and therefore was not forfeited by his failure to raise it.” Id. The Fourth Circuit rejected the claimant’s argument, stating, “While the time limit imposed on the [Government by § 983(a)(3) is mandatory, it is not jurisdictional.” Id. In reaching this conclusion, the court noted,
it readily appears that the provisions of § 983 are procedural rules for pursuing the forfeiture of seized assets. The subject matter jurisdiction for forfeiture is conferred by 28 U.S.C. § 1355(a); the authority to forfeit is provided by 21 U.S.C. § 881(a)(6); and the rules of procedure for pursuing a civil forfeiture are provided by 18 U.S.C. § 983.
Id. at 795. The court further noted that § 983(a)(3)(A) allows courts to “extend the period for filing a complaint for good cause shown or upon the agreement of the parties,” and stated that the possibility of an extension of time “undercuts any argument that the deadline is jurisdictional. Congress does not typically allow an agreement of the parties to define the scope of the district court’s authority to hear a case.” Id. Thus, the court concluded that “the provisions of § 983 are procedural rules for pursuing the forfeiture of seized assets,” not “conditions of subject matter jurisdiction.” Id.
The Wilson court relied on the decision of the United States Supreme Court in Dolan v. United States, 560 U.S. 605, 130 S.Ct. 2533, 177 L.Ed.2d 108 (2010), where Justice Breyer, speaking for the Court, analyzed in detail the effect to be given different statutory “deadlines.” 699 F.3d at 793. The statute under consideration in Dolan (the Mandatory Victims Restitution Act, 18 U.S.C. § 3664) provided that in sentencing “the court shall set a date for the final determination of the victim’s losses, not to exceed 90 days after sentencing.” The 90-day deadline passed, and the Supreme Court undertook to consider the consequences of the missed deadline where the statute does not specify the particular consequences. In answering that question, Justice Breyer noted that the Court has looked to statutory language, the relevant context, and “to what they reveal about the purposes that a time limit is designed to serve.” 560 U.S. at 610, 130 S.Ct. 2533. He considered first two possibilities: whether the 90-day deadline in the case before the Court had a jurisdictional purpose or whether it was an ordinary claim-processing rule. After rejecting those possibilities, he concluded that there was a third possibility which he held was applicable: “a time-related directive that is legally enforceable but does not *461 deprive a judge or other public official of the power to take the action to which the deadline applies if the deadline is missed.” Id. at 611, 130 S.Ct. 2533 (emphasis added).
The analysis applied by Justice Breyer in Dolan requires rejection of the majority’s position that the Government’s failure to file a civil forfeiture action within 90 days of the Langbords’ filing of a seized asset claim requires return of the Golden Eagles to the Langbords. The first factor to which Justice Breyer looked was the statutory language. He noted that the use of the word “shall” in the statute’s time-related directive has not, alone, “always led this Court to interpret statutes to bar judges (or other officials) from taking the action to which a missed statutory deadline refers.” Id. (emphasis added). Similarly, the use of the word “shall” in § 983(a)(3)(A) (“Not later than 90 days after a claim has been filed, the Government shall file a complaint for forfeiture .... ” (emphasis added)) is not dispositive here. As Justice Breyer explained, the statute’s “main substantive objectives” control. Id. at 613, 130 S.Ct. 2533. In Dolan, the statute at issue was meant to “help victims of a crime secure prompt restitution rather than to provide defendants with certainty as to the amount of their liability.” Id. Applying similar reasoning, we see that CAFRA’s purpose is not to deprive the Government of its property, but rather to determine the rightful owner of the property. As stated in the House Report introducing CAFRA,
H.R. 1965 [CAFRA] is designed to make federal civil forfeiture procedures fair for property owners — to give innocent property owners the means to recover their property and make themselves whole. H.R. 1965 is not designed to emasculate federal civil forfeiture efforts. To the contrary, by making civil forfeiture fairer, this Committee is prepared to (and H.R. 1965 does) expand the reach of civil forfeiture and make it an even stronger law enforcement tool.
H.R.Rep. No. 105-358(1), at 27 (1997). Therefore, as in Dolan, I disagree with reading the word “shall” in the statute to deprive the Government of the opportunity to pursue its property claim.
The effect of a missed statutory deadline does not require the Government to lose its opportunity to provide the proceedings that were missed, as noted in cases from the Supreme Court, the other courts of appeals and the district courts. As explained in its comprehensive analysis, the Fourth Circuit classified the 90-day “deadline” in another forfeiture statute as a “time-related directive,” one even more forgiving than a “claims processing rule.” United States v. Martin, 662 F.3d 301, 308 (4th Cir.2011). The majority continually stresses that CAFRA “requires” the Government to file a civil forfeiture action. Here again, the Dolan opinion and its progeny show that the majority is wrong.
In Dolan, the Court was concerned about the possible harm to the victim from the missed deadline. In this case, the majority hypothesizes no harm to the Langbords. Although the majority does not point us to a single way in which the Langbords were harmed, it argues that they were prejudiced by the Government’s “undue delay.” The District Court addressed the issue of delay in the context of the Langbords’ objection to the Government’s filing of its declaratory judgment claim. Judge Davis denied the Langbords’ objection, stating, “Permitting the United States to now bring its desired ... declaratory judgment count[ ] neither introduces new factual issues nor revives irrelevant disputes. In short, [the Langbords] will occupy no worse a position than had the Government brought this counterclaim *462 when answering the 2006 complaint.” App. at 125-26. I agree.
The majority also presses its case against the Government for its alleged failure to comply with § 983 requiring notice of its seizure within 60 days. I note that the Langbords were aware from the very beginning of the matter of the Government’s position as to the Golden Eagles. Shortly after the Langbords’ counsel presented the coins to the Mint for authentication and sought $40 million for them from the Government, App. 144[2], the Government’s counsel sent him a written memorandum advising that the coins were government property and “that the U.S. Mint has no intention of seeking forfeiture of [them].” App. at 143-44. Thus, the Langbords were on notice of the Government’s chosen course of action well within the statute’s 60-day notice requirement, and therefore suffered no prejudice from lack of notice.
In Dolan, the Court stated that the party normally can mitigate any harm that a missed deadline might cause by simply telling the court or setting a timely hearing, which is what happened in this case. See 560 U.S. at 615-16, 130 S.Ct. 2533. When the Langbords raised the absence of a hearing Judge Davis ordered one. There are numerous cases, including those in the Supreme Court, the other circuits, and the district courts, that applied the same approach. Id. at 611, 130 S.Ct. 2533 (finding a court’s violation of the statutory timeframe to sentence a defendant to be a mere “time-related directive” that is legally enforceable but ultimately does not deprive the court of power to determine the substantive issue); Barnhart v. Peabody Coal Co., 537 U.S. 149, 171-172, 123 S.Ct. 748, 154 L.Ed.2d 653 (2003) (missed deadline for assigning industry retiree benefits does not prevent later award of benefits); Regions Hosp. v. Shalala, 522 U.S. 448, 459 n. 3, 118 S.Ct. 909 n. 3, 139 L.Ed.2d 895 n. 3 (1998) (even though Government missed the statutory deadline to file a report with Congress by approximately five years, the “failure to meet the deadline .... does not mean that [the] official lacked power to act beyond it”); United States v. Montalvo-Murillo, 495 U.S. 711, 722, 110 S.Ct. 2072, 109 L.Ed.2d 720 (1990) (missed statutory deadline for holding bail detention hearing does not require judge to release defendant); Brock v. Pierce Cnty., 476 U.S. 253, 266, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) (missed statutory deadline for making final determination as to misuse of federal grant funds does not prevent later recovery of funds); United States v. Williams, 720 F.3d 674, 702 (8th Cir.2013), cert. denied, - U.S. -, 134 S.Ct. 1337, 188 L.Ed.2d 345 (2014) (failing to follow criminal forfeiture procedures at trial does not relinquish the district court’s ability to order post-conviction forfeiture); Martin, 662 F.3d at 308-09 (deadline for the district court to enter a criminal forfeiture order is a “time-related directive” and thus missing the deadline did not strip district court of the power to enter forfeiture orders); Cyberworld Enter. Techs., Inc. v. Napolitano, 602 F.3d 189, 198 (3d Cir.2010) (Government was not precluded from taking action when it imposed sanctions on an employer eighteen months after the statutory limitations period expired); Shenango Inc. v. Apfel, 307 F.3d 174, 196-97 (3d Cir.2002) (affirming that Government could assign benefits to employees under the Coal Act even after end of the statutory deadline for such assignment because the statutory timeframe was not meant to strip the Government of power to act beyond the deadline); Sw. Pa. Growth Alliance v. Browner, 121 F.3d 106, *463 113-115 (3d Cir.1997) (denying petition to review the Environmental Protection Agency’s ruling even though the ruling occurred outside the statutory timeframe because the statutory timeframe does not divest the agency of jurisdiction to act); Marshall Durbin Food Corp. v. Interstate Commerce Comm’n, 959 F.2d 915, 919 (11th Cir.1992) (Interstate Commerce Commission’s (“ICC”) failure to review Administrative Law Judge’s (“ALJ”) preliminary decision within mandatory review period did not divest ICC of authority to reverse ALJ decision); Lowell Consortium v. U.S. Dep’t of Labor, 893 F.2d 432, 433 n. 3 (1st Cir.1990) (allowing agency to recover funds almost five years after 120-day mandatory period had expired); City of Camden v. U.S. Dep’t of Labor, 831 F.2d 449, 451 (3d Cir.1987) (allowing agency to' recover funds six years after 120-day mandatory period had expired); St. Regis Mohawk Tribe, N.Y. v. Brock, 769 F.2d 37, 46 (2d Cir.1985) (Government’s failure to comply with the 120-day time limit for directing repayment of misspent federal grant funds did not bar Government from making the determination as it would “sacrifícete] the public interest because of the negligence of public officers”); Balt. & Ohio Chi. Terminal R.R. v. United States, 583 F.2d 678, 690 (3d Cir.1978), cert. denied, 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979) (because the Interstate Commerce Act “contains no express sanction for noncompliance” with the statutory deadline, belated agency proceedings need not be dismissed); Usery v. Whitin Mach. Works, Inc., 554 F.2d 498, 501 (1st Cir.1977) (under the Trade Act of 1974, the Government may determine an employee’s eligibility for economic assistance even if the determination is outside the 60-day statutory limit).
The majority disparages my dissent’s use of what it calls “easily distinguishable cases” that do not involve § 983(a)(3). See Maj. Op. at 455 n. 19. The numerous cases cited in the dissent are hardly “easily distinguishable.” They involve forfeiture, as does CAFRA. It was my understanding that appellate opinions frequently apply reasoning from similar, albeit different statutes, to make a point. The majority apparently requires one-on-one identity with the statute under consideration. The majority apparently feels free to censure a mere colleague’s use of analogous precedent, but it apparently doesn’t notice or recognize application of the same approach by a member of the Supreme Court of the United States. For example, Justice Breyer, in Dolan, uses as precedent for the Court’s analysis of the Mandatory Restitution Act what the majority would regards as “easily distinguishable” statutes. See Dolan, 560 U.S. at 612, 130 S.Ct. 2533 (citing Montalvo-Murillo, 495 U.S. at 718-19, 110 S.Ct. 2072 (interpreting Bail Reform Act of 1984); Brock, 476 U.S. at 262, 106 S.Ct. 1834 (interpreting Comprehensive Employment Training Act); Barnhart, 537 U.S. at 158-63, 123 S.Ct. 748 (interpreting Coal Industry Retiree Health Benefit Act of 1992); Regions Hosp., 522 U.S. at 459 n. 3, 118 S.Ct. 909 n. 3 (interpreting Medicare Act)).
It stands to reason, then, that the proper remedy for a failure to follow CAFRA’s notice or filing timeframes is to order the Government to comply with the statute, and many courts have so held. For example, in DeSaro v. United States, No. 06-ev-20531 (S.D.Fla. Aug. 8, 2006), after the 11th Circuit had remanded the individual’s CAFRA claim against the Government for its seizure and four year retention of two oil paintings without filing a forfeiture suit and without providing the required 60 day notice in criminal actions, the district court held that because the ownership and forfeitability of the paintings had been the subject of litigation almost since they were *464 seized, the “requirement to bring a timely forfeiture action is therefore tolled.” Id.; see also Garcia v. Meza, 235 F.3d 287, 292 (7th Cir.2000) (ordering Government to either return the property or institute judicial forfeiture proceedings after Government’s original attempt at notice was deemed not to have afforded due process); United States v. Giraldo, 45 F.3d 509, 512 (1st Cir.1995) (“If the notice turns out to have .been [constitutionally] inadequate, the forfeiture is void. The district court then must set aside the declaration of forfeiture and order the Customs. Service to return the money to Giraldo or begin judicial forfeiture proceedings in the district court.”); Lopez v. United States, 863 F.Supp.2d 127, 130 (D.Mass.2012) (“When a district court concludes that procedural deficiencies render an administrative forfeiture void, it must order the agency to return the seized property or begin judicial forfeiture proceedings.”); United States v. $114,143.00 in U.S. currency seized from Michael J. Calash’s Vehicle, 609 F.Supp.2d 1321, 1322-23 (S.D.Fla.2009) (ordering Government to file a forfeiture complaint after the Drug Enforcement Administration improperly rejected a seized asset claim, where the claimant was aware within the notice period that Government had commenced administrative forfeiture proceedings, and noting that “the interests of justice are best served here ... by allowing the parties to resolve [the forfeiture claim] on the merits” (alterations in original; internal citations omitted)).
The majority focuses exclusively on the “return of the Golden Eagles.” It does not challenge the District Court’s decision that the Government’s institution of a civil forfeiture proceeding would be an adequate remedy. In so ruling, the District Court stated that “[the Langbords] concede that return is not required if the Government promptly initiates a judicial forfeiture proceeding.” App. at 157 (citing Plaintiffs’ Motion for Summary Judgment, Due Process & Illegal Seizure). The Court continued, “it is well established that ‘illegal seizure of property does not immunize it from forfeiture as long as the [Government can sustain the forfeiture claim with independent evidence.’ ” Id. (citing United States v. Pierre, 484 F.3d 75, 87 (1st Cir.2007); United States v. 47 West 644 Route 38, 190 F.3d 781, 782 (7th Cir.1999)). The majority never explains why the ten day forfeiture trial presided over by Judge Davis, “at which time the [Langbords could] raise whatever defenses [were] available to them,” did not provide an adequate remedy. App. at 165 (citing United States v. Von Neumann, 474 U.S. 242, 251, 106 S.Ct. 610, 88 L.Ed.2d 587 (1986); Garcia v. Meza, 235 F.3d 287, 292 (7th Cir.2000); Giraldo, 45 F.3d at 512).
As to the adequacy of the remedy ordered I note the Ninth Circuit’s comments in United States v. $11,500.00 in U.S. Currency, 710 F.3d 1006 (9th Cir.2013), another CAFRA case where the Government was directed to send notice after missing the statutory deadline. The court asked, “is the [Government' required to return the property even if it has in the meantime commenced forfeiture proceedings?” Id. at 1016. In that case, by the time the issue was raised before the district court, the forfeiture proceeding was underway. The Ninth Circuit responded to its own question: “requiring the return of the property and then permitting the [Government to immediately re-seize it would impose a meaningless exercise.” Id.; see also United States v. $114,031.00 in U.S. Currency, No. 06-CIV-21820, 2007 WL 2904154, at *3 (S.D.Fla. Oct. 4, 2007); Sal-mo v. United States, No. 06-12909, 2006 WL 2975503, at *3 (E.D.Mich. Oct. 17, 2006); Manjarrez v. U.S. Dep’t of the Treasury, Nos. 01 C 7530 & 01 C 9495, *465 2002 WL 31870533, at *2 (N.D.Ill. Dec. 19, 2002).
That leads to one of my principal bases for diverging from the majority: it does not acknowledge that a forfeiture proceeding did in fact take place and simply omits to mention the result of that proceeding. It is indeed baffling that the majority, which fervently asserts that a forfeiture proceeding should have taken place earlier (precise date never listed), disregards the result of the forfeiture proceeding when it did take place. After a ten-day trial before Judge Davis, the jury found “in favor of the United States on Count [I] (forfeiture)” — a verdict the District Court found was fully supported by the evidence. App. at 59.
In its post-trial findings, the District Court laid out the substantial evidence the Government presented at trial in support of its case. The District Court reviewed the Government’s evidence of the movements of all 445,500 1933 Double Eagles that were minted as presented through its expert, David Tripp’s, testimony about the Mint’s “meticulous,” “exquisitely detailed” records. App. at 9-11. The Court noted that “Tripp accounted for each and every one of the 445,500 1933 Double Eagles, and showed that not a single '33 Double Eagle was issued to the public.” App. at 12. The Court noted that the “first ‘bank holiday’ forbidding the payout of gold coins took effect on March 6[, 1933], nine (9) days before the first shipment of '33 Double Eagles to the Philadelphia Mint cashier.” Id. On June 27, 1933, 445,000 of the coins were sealed in a basement vault at the Mint. Id. “The remaining 500 coins were in the cashier’s control at one point or another.” Id. After 29 coins were destroyed and 437 were returned to the Mint’s basement vaults, the cashier was left with 34 coins. Id. The records reflect that all 34 coins that remained with the cashier “were moved to a basement vault on February 2, 1934.” Id. at 12-13. The Mint sent two coins to the Smithsonian in October of 1934. Id. at 13.
[T]he Mints were authorized to begin melting their general stock of gold coins as of August 4, 1934. That included, of course, the '33 Double Eagles held in the Philadelphia Mint’s vault. The Mints started melting gold shortly thereafter, and the entire process took about two-and-a-half years to complete. Because Tripp could account for all of the '33 Double Eagles and none were ever authorized for release, Tripp concluded that no '33 Double Eagles — including the coins in this case — could have been obtained through legitimate means.
Id. at 13-14.
The District Court found, relying on Tripp’s testimony, that “[t]he jury saw no record of a legitimate '33 Double Eagle release, and from this lack of documentation one may reasonably infer that the responsible party appropriated the coins in secret, knowing full well the wrongfulness and illegality of his actions.” App. at 35. Furthermore, despite Switt’s own testimony, in earlier proceedings, that he never obtained any gold coin from the Philadelphia Mint, Switt and McCann’s[3] bank accounts evidence thousands of dollars of deposits to McCann’s bank accounts that emanated from an account Switt controlled. And, “the Secret Service determined that McCann was the likely inside source of the '33 Double Eagles; as Mint cashier, McCann had the opportunity to abscond with the coins, and McCann’s conviction for stealing other coins from the *466 Mint shows that he knew how to pull it off.” App. at 36. After a lengthy investigation, the Secret Service could not identify any 1933 Double Eagle that left the Mint other than coins traced to the possession of Israel Switt.
As to the Langbords’ knowledge, the Government presented evidence that in 2002, after reading a New York Times article about the Fenton 1933 Double Eagle (which mentioned Switt), Roy Langbord called Joan Langbord to ask if Switt (his grandfather) had kept any more of the coins. Joan Langbord admitted to looking into the safe deposit box that contained the Double Eagles many times over the years, including the day before the Fenton coin was auctioned, but maintained that she knew nothing about the coins until she discovered them at the bottom of the same safe deposit box in 2003. As the District Court noted,
the evidence supports an inference that Joan Langbord knew her father had stolen the coins and hidden them in the family’s safe deposit box; she found the coins well before the Fenton '33 Double Eagle went up for auction and continued to conceal them; ’ her son Roy also knew of the questionable provenance of [the] 1933 Double Eagles, at least after reading the New York Times piece in 2002; and the Langbords decided to reveal the coins to the Government only after learning of their immense monetary value, hoping to cash-in like Stephen Fen-ton did.
Id. at 37. Thus, substantial evidence supports the jury’s verdict and the District Court’s declaratory judgment that the coins left the Mint illegally, that Switt was involved, that his relatives knew that the coins’ acquisition was illegal and continued to conceal them, and thus, that the coins should be forfeited. None of the evidence discussed above relies upon the Secret Service reports, the admissibility of which, as the majority references, was contested on appeal on hearsay grounds [4].
On Count II (declaratory judgment), the District Court declared:
The disputed Double Eagles were not lawfully removed from the United States Mint and accordingly, as a matter of law, they remain the property of the United States, regardless of (1) the applicability of CAFRA to the disputed Double Eagles, (2) Claimants’ state of mind with respect to the coins, or (3) how the coins came into the Claimants’ possession.
App. at 5.
Though the majority’s entire objection to the Government’s position in this case stems from the Government’s failure to file a forfeiture suit, and its failure to do so within the 90-day period that CAFRA fixes for that action, the majority gives no credit to the result of the judgment.
Finally, I believe Congress would be incredulous if this court were to hold that the Langbords should be given the Golden Eagles for which they originally sought $40 million because a federal lawyer did not file a forfeiture complaint within 90 days of the applicants filing a seized asset claim, notwithstanding the decision of two triers of fact that the Golden Eagles at issue belonged to the United States.
II
The majority rejects the Government’s position (and the District Court’s conclu *467 sion) that the Government never instituted administrative forfeiture proceedings in this case because it never sent notice of its intent to forfeit the coins. The majority reasons, in part, that notice cannot possibly be the triggering event for CAFRA’s timeframes because, it believes, the forfeiture statutes require notice in “some, but not all, nonjudicial civil forfeiture proceedings.” Maj. Op. at 450-51. I cannot agree with this reading of the forfeiture statutes. Section 1607 merely exempts “vessels], vehicle[s], aircraft, [and] merchandise” worth over $500,000 from the administrative forfeiture process altogether, meaning that for such objects, the Government would have to resort to judicial forfeiture. See Stefan D. Cassella, Asset Forfeiture Law in the United States 154-55 (2d ed.2013). Objects not covered by § 1607 are addressed in a later statutory section:
If any vessel, vehicle, aircraft, merchandise, or baggage is not subject to section 1607 of this title, the appropriate customs officer shall transmit a report of the case, with the names of available witnesses, to the United States attorney for the district in which the seizure was made for the institution of the proper proceedings for the condemnation of such property.
19 U.S.C. § 1610. Thus, rather than sending notice to interested parties as for an administrative forfeiture, seized property not subject to § 1607 is referred to the U.S. Attorney for judicial forfeiture proceedings. See Malladi Drugs & Pharm., Ltd. v. Tandy, 552 F.3d 885, 887 (D.C.Cir.2009) (“Under the customs laws, the DEA may forfeit seized goods valued at more than $500,000 only upon a judicial decree after judicial forfeiture proceedings, 19 U.S.C. § 1610, but may administratively forfeit goods valued at or less than $500,000.”). The reason for this is that “forfeitures involving more valuable property must be processed through the judicial system.” 135 Cong. Rec., S12622-01 (daily ed. Oct. 4, 1989) (Statement of Sen. Joseph Biden). However, as the majority recognizes, the Double Eagles are monetary instruments which do not fall under the $500,000 threshold of § 1607(a)(1) and for which administrative forfeiture is allowed. See 19 U.S.C. § 1607(a)(4).
Furthermore, the majority’s contention that § 983(e)(1) (“[a]ny person entitled to written notice in any nonjudicial civil forfeiture proceeding under a civil forfeiture statute who does not receive such notice may file a motion to set aside a declaration of forfeiture with respect to that person’s interest in the property”) contemplates administrative forfeitures beginning without notice being sent, see Maj. Op. at 451-52, disregards the fact that the Government often seizes property and does not know all of the parties that may have an interest in the property. The notice provision requires the Government both to send notice “to each party who appears to have an interest in the seized article” and to publish notice in the newspaper for this very reason. 19 U.S.C. § 1607(a). Cassella explains that the Government must generally send notice to “the person from whom the property was seized, the titled owner of the property, lienholders, and any other person known to the Government to have an interest.” Cassella, supra, at 175. Section 983 specifically provides for situations in which “the identity or interest of a party is not determined until after the seizure or turnover but is determined before a declaration of forfeiture.” 18 U.S.C. § 983(a)(1)(A)(v). Thus, I read § 983(e)’s discussion of a party “who does not receive such notice” to contemplate instances in which a person has an interest in seized property, but to whom the Government does not send notice because it does not know that person’s identity — not because *468 it has no obligation to contact that person. Indeed, § 983(e) allows such persons to set aside forfeiture where “(A) the Government knew, or reasonably should have known, of the moving party’s interest and failed to take reasonable steps to provide such party with notice; and (B) the moving party did not know or have reason to know of the seizure within sufficient time to file a timely claim.” Id. § 983(e). Far from evidencing that an administrative forfeiture proceeding begins before notice is given, § 983(e) reinforces the notion that notice is required to institute administrative forfeiture.
Ill
The majority questions whether the District Court had the authority to issue a declaratory judgment in a CAFRA case. Under the Declaratory Judgment Act, “any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.” 28 U.S.C. § 2201(a). Rule 57 provides, “The existence of another adequate remedy does not preclude a declaratory judgment.” Fed.R.Civ.P. 57. The District Court entered declaratory judgment for the Government, ruling that the “Double Eagles were not lawfully removed from the United States Mint and accordingly, as a matter of law, they remain the property of the United States.... ” App. at 5.
The majority vacates the declaratory judgment on a basis no court has accepted.
The Advisory Committee notes to Rule 57 state, “A declaration may not be rendered if a special statutory proceeding has been provided for the adjudication of some special type of ease, but general ordinary or extraordinary legal remedies, whether regulated by statute or not, are not deemed special statutory proceedings.’.’ Id. (1937 Advisory Committee notes); see also Katzenbach v. McClung, 379 U.S. 294, 296, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (declaratory relief “should not be granted where a special statutory proceeding has been provided”). The majority holds that CAFRA is a “special statutory proceeding” under Rule 57.
However, since the enactment of the Declaratory Judgment Act, only a handful of categories of cases have been recognized as “special statutory proceedings” for purposes óf the Advisory Committee’s Note. These include: (i) petitions for habeas corpus and motions to vacate criminal sentences; (ii) proceedings under the Civil Rights Act of 1964; and (iii) certain administrative proceedings.
N.Y. Times Co. v. Gonzales, 459 F.3d 160, 166 (2d Cir.2006) (internal citations omitted). The parties do not direct us to, nor could I find, any case finding forfeiture statutes to preclude declaratory judgment, and the majority’s interest in being the first court to so hold is questionable.
In support of its argument that CAFRA fits as a “special statutory proceeding,” the majority, noting the inclusion of the Civil Rights Act of 1964 within that rare group of statutes that have been held to fit within that category, compares CAFRA with the Civil Rights Act of 1964. Maj. Op. at 457. That such a comparison could be issued in an opinion of the Third Circuit which has a distinguished history in support of civil rights, whatever the context, shocks my conscience. I can attribute it only to the desperation of its position.
Moreover, as the District Court noted, even where a statute provides for “special statutory proceedings” that would normally preclude declaratory judgment, a de *469 claratory remedy may still be necessary. See App. at 64. The District Court reasoned, “even if CAFRA did typically provide a special statutory remedy, it does not do so in this case.” Id. The Court considered the Government to be playing a dual role in this action: as a representative of the people of the United States seeking forfeiture of the proceeds of an alleged crime, and as the property owner seeking to reestablish legal title to the coins. CAFRA’s remedies could accomplish the forfeiture, but could not establish the property interest the Government sought to vindicate. Therefore, the Court determined that the Government could pursue declaratory relief. The numerous district courts throughout the county who hear CAFRA cases will be surprised to read that the Third Circuit has deprived them of a tool they have used as a matter of course. Why? Is the majority so eager to go down in history as the first court to scuttle a useful procedure?
In responding to the Government’s requested declaration that the disputed Double Eagles were not lawfully removed from the United States Mint and accordingly remain the property of the United States, the Langbords argued that the declaration “would impermissibly interfere with the province or the jury.” App. at 57. The District Court noted, “Since the Government won on the forfeiture claim, the jury must have found the coins were ‘not lawfully removed’ from the Mint.” Id. It then noted, “The principle of jury supremacy binds us to that finding.” Id. (citing Roebuck v. Drexel Univ., 852 F.2d 715, 717 (3d Cir.1988)). That principle also binds my colleagues as it did the District Judge, who also stated it made it “unnecessary [for the District Court] to conduct any additional fact finding to resolve the Government’s declaratory judgment claim.” Id.
IV
A careful review of the provisions of CAFRA, its legislative history, and the cases that have interpreted it reveals that the purpose of the statute, its notices, and its detailed procedures, is to allow those claiming an interest in potentially forfeitable property to have the merits of their case heard by a fact finder, who will reach a fair determination as to which party among those who lay claim on the subject in dispute is entitled to the subject. It is that ultimate issue that counts, which party is entitled to the property, even if the time taken to reach that decision has been significant. This case presented several difficult and complex issues for the District Court to resolve. In a series of particularly well-reasoned opinions, the District Court handled these issues thoroughly and thoughtfully, and I would affirm. I believe the majority misreads the statute, the relevant precedent, and Congress’ intent.

. The Government has chosen not to rely on the characterization of the Golden Eagles as "contraband” and thus does not argue the application of 18 U.S.C. § 983(a)(1)(F), which provides that "The Government shall not be required to return contraband or other property that the person from whom the property was seized may not legally possess.” Because gold may now be possessed, we will not try to determine whether the Golden Eagles were contraband at the time McCann and Switt illegally removed them from the Mint.

. Later, the Langbords lowered their claim to $7 or $8 million.

. Recall that Switt was the source of the Langbords’ coins and McCann was the cashier at the Philadelphia U.S. Mint during the relevant period.

. The majority states that it does not reach the hearsay-within-hearsay rule, see Maj. Op. at 447 n. 5, but it then proceeds to reach it. I will not reach that issue because, as set forth in the text, there is ample evidence to support the jury’s verdict without relying on the Secret Service reports.